PER CURIAM.
Michael Gordon Reynolds appeals an order of the circuit court denying his motion to vacate his convictions of first-degree murder and sentences of death under Florida Rule of Criminal Procedure 8.851 and petitions this Court for a writ of habe-as corpus. We have jurisdiction. See art. Y, § 3(b)(1), (9), Fla. Const. For the reasons provided below, we affirm the denial of the rule 3.851 motion and deny his petition for a writ of habeas corpus.
Background Trial Court Proceedings
A jury convicted Michael Gordon Reynolds of first-degree murder in connection with the deaths of Robin Razor and her eleven-year-old daughter, Christina Razor; second-degree murder in the death of Danny Ray Privett, Christina’s father; and burglary of a dwelling during which a battery upon Robin or Christina or both was committed while Reynolds was armed with a weapon. See Reynolds v. State, 934 So.2d 1128,1137 (Fla.2006). The jury recommended death by a unanimous vote for the murders of Robin and Christina Razor. See id. at 1138. The trial court sentenced Reynolds to life in prison for the murder of Privett and the burglary conviction, and sentences of death for the murders of the Razors, all to run concurrently. See id. In our opinion that affirmed the imposition of the death penalty, this Court detailed the following facts with regard to the underlying crimes:
The circumstances surrounding the crimes involved in this matter and the nature of the physical evidence cause the facts established at trial to be crucial in our analysis of this case. Specifically, we note that physical evidence produced at trial placing Reynolds at the scene of the crimes, inconsistencies in Reynolds’ statements to the authorities regarding injuries he sustained on the evening the murders were committed, and evidence tending to establish his involvement in the murders are all important to our decision to affirm Reynolds’ convictions and sentence.... On July 22, 1998, the bodies of the victims were found on the property located at 1628 Clekk Circle in Geneva, Florida. Danny’s body was found outside near a large pine tree, and the bodies of Robin and Christina were found inside a trailer in which the victims were living.
*466 [[Image here]]
The evidence established that on July 22, 1998, Shirley Razor, the mother of victim Robin Razor, traveled to the crime scene to deliver items Danny used in the work he was doing on trailers at that location. Upon arriving at the property, Shirley noticed Danny lying on the ground outside. Shirley, being accustomed to seeing Danny drunk and passed out, proceeded to her separate trailer on the property and ate her lunch. After finishing her lunch, Shirley walked over to the trailer in which Danny and Robin were living when she noticed that Danny had a “hole in his head.” After discovering that Danny was dead, Shirley ran to a neighbor’s residence and called the authorities. Subsequent to the arrival of the fire department personnel, Shirley went to her daughter’s trailer and upon looking inside found that her daughter, Robin, and her granddaughter, Christina, were inside and apparently dead.
At trial, a medical examiner, Dr. Sara Hyatt Irrgang, testified that the deaths had occurred at least eight hours, but probably more than twelve hours prior to her arrival at the crime scene, placing the time of death between nine p.m. on July 21 and seven a.m. on the morning of July 22. The evidence demonstrated that Danny Ray Privett was found lying outside beneath a large pine tree on his side with his face down, surrounded by bloody pieces of concrete block and broken pieces of glass. Danny’s jeans were partially unzipped suggesting that he had been in the process of urinating when the attack occurred. The autopsy of Danny Ray Privett revealed that he suffered a large depressed skull fracture with additional injuries to the head area. The wounds appeared to have been caused by three or more separate blows, with the injuries indicating that the assailant had been behind the victim. There was no indication of any defensive wounds on Danny, and examination of his major skull injury revealed that the injury was likely caused by a partially broken cinder block, based on fragments found within the wound. The medical examiner was unable to determine the order in which the injuries had been inflicted upon him. The cause of death for Danny was determined to be primarily due to blunt force trauma to the head with the large depressed skull fracture probably being the fatal blow. If this blow had been inflicted first, the medical examiner opined that the victim would have lost consciousness within a second to a minute or two.
Robin and Christina Razor were found dead inside the living room portion of the camper trailer being used as living quarters. Robin was found lying on the ■floor, face up. Christina was found nearby sitting on the couch and leaning to her left. The living room area was in disarray and a large amount of blood was scattered throughout this area of the trailer. Robin Razor’s autopsy revealed that she suffered multiple stab wounds along with multiple blows to the side of her face and a broken neck resulting in injuries to her spinal cord. Closer examination revealed that Robin suffered ten stab wounds to the head and neck area and one to the torso area. The wounds appeared to have been inflicted with a sharp object such as a knife or scissors. Based on examination of [] Robin’s body and the defensive wounds present, the medical examiner opined that she had been involved in a violent struggle. In addition to the above wounds, Robin suffered multiple superficial wounds to her torso area which the medical examiner stated to be consistent with torment wounds— *467 wounds produced not to cause serious injury but to cause aggravation and produce fear in the victim. The medical examiner was of the opinion that because blows to the victim’s head were inflicted at different angles and the presence of significant defensive wounds, it was likely that she was conscious and struggling when these wounds were inflicted. The primary cause of death for Robin was determined to be the broken neck and spinal cord injury, although bleeding from the stab wounds would have also resulted in death.
The autopsy of Christina Razor revealed that she suffered blunt force trauma to her head, a stab wound to the base of her neck that pierced her heart, and another stab wound to her right shoulder that pierced her lung and lacerated her pulmonary artery. These latter two wounds would have resulted in significant internal and external hemorrhaging and would have been fatal. The medical examiner indicated that the only sign of defense wounds to Christina was the presence of a small contusion to her left hand, which could have occurred as she attempted to block a blow from her assailant. The medical examiner opined that Christina would have lost consciousness within a minute or two of receiving the stab wounds. The primary cause of death for Christina was determined to be internal and external hemorrhaging.
During his investigation of the crimes, Investigator John Parker of the Seminole County Sheriffs Department made contact with Reynolds and requested that he submit to an interview, to which Reynolds voluntarily agreed. During this interview, Investigator Parker also inquired about injuries that he observed on Reynolds’ hand and ankle. In response to inquiries made about these injuries, Reynolds advised the investigator that at approximately five a.m. on the morning that the victims’ bodies were discovered, he was taking his dog outside and slipped on the exterior step of his camper, twisting his ankle. Reynolds stated that the cut on his hand occurred when he caught his hand on a burr on the aluminum door frame of his trailer as he attempted to break his fall by grabbing the door frame. Reynolds advised the investigator that approximately thirty or forty minutes after sustaining the injuries he cleaned the cut to his hand and proceeded to an emergency room for treatment. Reynolds stated that while on his way to the emergency room he suffered a flat tire and borrowed a jack from a convenience store to change his tire and after doing so he proceeded to the emergency room. After receiving treatment for his injuries, Reynolds informed the investigator that he returned to his residence and removed the burr from the trailer door frame with a pair of channel-lock pliers.
In addition to the discussion concerning the injury, Reynolds also discussed an altercation in which he was involved with Danny Ray Privett regarding a trailer that was allegedly given to Reynolds by his landlord. According to Reynolds, the argument with Danny was centered upon Danny removing the trailer from Reynolds’ property without permission. Upon discovering that Danny had removed the trailer, Reynolds indicated that he confronted Danny and a heated argument ensued. Reynolds stated that after exchanging words with Danny, he left Danny’s property but returned a short while later to apologize and advise Danny that he could keep the trailer. Significantly, during this interview Reynolds advised the investigator that he had never been inside the trailer in which the victims were living. Subse *468 quent to this interview, Reynolds gave permission for the search of both his trailer and his vehicle, and he also agreed to provide hair and blood samples for DNA analysis. Additionally, pursuant to a search warrant certain evidence was seized from Reynolds’ vehicle and residence.
At trial, a neighbor of the victims testified that on the night prior to the discovery of the bodies he observed a car similar to that of Reynolds!’] parked at the victims’ residence. Fingerprint and shoe pattern analysis of the crime scene and items collected from the scene revealed several prints of value, but none of them connected Reynolds to the scene. However, extensive evidence with regard to DNA analysis resulting from testing of items of evidence recovered from the crime scene was presented. Several of the items recovered from the crime scene inside the trailer and on the exterior of the trailer contained a DNA profile matching that of Reynolds. There was no eyewitness testimony offered by the State and, other than the concrete block allegedly used to strike the victims, no other weapon was recovered.
The defense attempted to establish mishandling and contamination of the evidence, along with suggesting that other individuals had committed the crimes with which Reynolds had been charged.... After hearing all the evidence, the jury rendered a verdict finding Reynolds guilty of second-degree murder as to the death of Danny Pri-vett, two counts of first-degree murder as to the deaths of Robin and Christina Razor, and burglary of a dwelling during which a battery was committed while Reynolds was armed with a weapon.
Id. at 1134-37.
In rendering the death sentence, the trial court determined that the State had proven the existence of four statutory aggravating factors in the murder of Robin Razor: (1) Reynolds had previously been convicted of aggravated robbery, aggravated assault, and aggravated battery in incidents prior to those associated with the present case, see § 921.141(5)(b), Fla. Stat. (2003); (2) Reynolds committed the capital felony while he was engaged in or was an accomplice in the commission of or an attempt to commit a burglary of a dwelling, see § 921.141(5)(d), Fla. Stat. (2003); (3) the capital felony was committed for the purpose of avoiding a lawful arrest, see § 921.141(5)(e), Fla. Stat. (2003); and (4) the capital felony was committed in an especially heinous, atrocious, or cruel fashion, see § 921.141(5)(h), Fla. Stat. (2003). See Reynolds, 934 So.2d at 1138. The trial court assigned each of these aggravators great weight. See id.
As to the murder of Christina Razor, the trial court found that the State had proven the existence of five statutory ag-gravators: (1) Reynolds had previously been convicted of aggravated robbery, aggravated assault, and aggravated battery in incidents prior to those associated with the present case, see § 921.141(5)(b); (2) Reynolds committed the capital felony while he was engaged in or was an accomplice in the commission of or an attempt to commit a burglary of a dwelling, see § 921.141(5)(d); (3) the capital felony was committed for the purpose of avoiding a lawful arrest, see § 921.141(5)(e); (4) the capital felony was committed in an especially heinous, atrocious, or cruel fashion, see § 921.141(5)(h); and (5) the victim of the capital felony was a person less than twelve years of age, see § 921.141(5)(i), Fla. Stat. (2003). See Reynolds, 934 So.2d at 1138. The trial court assigned each of these aggravators great weight. See id.
In the analysis of mitigation evidence, the trial court acknowledged that Reynolds *469 had waived the presentation of such evidence, but considered and weighed any mitigation of which it was aware. The trial court found the following nonstatuto-ry mitigating circumstances to be applicable to the murders of both Robin and Christina Razor, see 921.141(6)(h), Fla. Stat. (2003):(1) Reynolds had been gainfully employed; (2) he manifested appropriate courtroom behavior throughout the proceedings; (3) he cooperated with law enforcement; and (4) he had a difficult childhood. The court assigned each of these factors little weight. See Reynolds, 934 So.2d at 1138-39. The court determined that the evidence did not establish that Reynolds could easily adjust to prison life. See id. at 1139. The court recognized that Reynolds had attempted to present evidence to establish lingering doubt, but ruled that it would not consider any theory of lingering doubt as nonstatu-tory mitigation in the sentencing analysis. See id.
On direct appeal, this Court affirmed the convictions and sentences. See id. at 1161. Reynolds filed a petition for writ of certio-rari in the United States Supreme Court, which was denied on January 8, 2007. See Reynolds v. Florida, 549 U.S. 1122, 127 S.Ct. 943, 166 L.Ed.2d 721 (2007).
Postconviction Proceedings
On December 28, 2007, Reynolds filed a motion to vacate and set aside his convictions and sentences pursuant to rule 3.851. The motion set forth the following claims:
(1) State misconduct in allowing DNA expert Charles Badger to testify that DNA from Reynolds was found on vaginal swabs from Christina Razor and introduce an unsupported sexual battery theory and
(2) a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in a failure to disclose the extent of the involvement of a lab technician in the DNA testing and the lack of integrity of a deputy. The motion also set forth that trial counsel were ineffective for: (3) failing to object to or cure the testimony of Charles Badger; (4) failing to object to the theory of sexual battery as a motive for the homicides; (5) failing to object to the repetition of the sexual battery theory in the closing statement from the State or to rebut the theory effectively in closing; (6) failing to object to a misstatement of law regarding the burdens of proof stated by the trial court during voir dire, and in not moving for a mistrial; (7) failing to conduct proper and reasonable voir dire; (8) informing prospective jurors during voir dire of prior criminal convictions although no “Williams Rule” notice had been filed; (9) failing to request a jury interview to determine whether any jurors had seen a memorial to the victims constructed outside the courtroom, and for not moving for a mistrial based on the presence of the memorial; (10) failing to object to thirty-seven autopsy photographs being placed into evidence; (11) failing to object to lay witness testimony concerning metallurgical issues of a trailer door; (12) failing to object to testimony concerning a prior arrest on a warrant from Hillsbor-ough County; (13) failing to object to lay witness testimony concerning the condition of clothing on the day of the homicides; and (14) failing to properly present certain issues to the jury and failing to preserve those issues for appeal. He also asserted (15) Section 27.702, Florida Statutes (2004), which mandates the duties of capital collateral regional counsel, is unconstitutional; (16) Florida Rule of Criminal Procedure 3.575 and Rule Regulating the Florida Bar 4-3.5(d)(4), which prohibited trial counsel from interviewing jurors to determine if constitutional error was present, violates the federal and Florida constitutions; and (17) the cumulative errors of trial counsel deprived Reynolds of a fair trial.
*470 Reynolds requested an evidentiary hearing for all claims. On April 3, 2008, the postconviction court held a Huff[1] hearing, after which it summarily denied claims 1, 2, 3, 6, 11, and 13. The postconviction court held that claims 15 and 16 did not require an evidentiary hearing, and deemed claim 17, regarding cumulative error, premature. Due to a conflict, Capital Collateral Regional Counsel was discharged before the evidentiary hearing. Reynolds acted pro se for a short time before new counsel was appointed.
After new counsel was appointed, Reynolds filed an amended motion to vacate his convictions and sentences and requested an evidentiary hearing. This amended motion added five claims to his original motion. These claims were that: (I) trial counsel were ineffective for failing to investigate and present evidence of substantial mitigation, including mental health mitigation; (II) trial counsel were ineffective for failing to investigate or present testimony to support the defense theory that reasonable doubt of guilt existed due to a conflict in the evidence, or that the evidence was legally insufficient for a conviction and failing to support an alternative theory that persons other than Reynolds killed the decedents; ■ (III) the lethal injection procedure in Florida violates the federal and Florida constitutions because it constitutes cruel and/or unusual punishment; (IV) trial counsel were ineffective for failing to request removal of a sleeping juror who had been admonished and then proceeded to fall asleep during critical testimony; and (V) trial counsel were ineffective for failing to prepare Reynolds to testify after informing the jury that he would testify and after trial counsel informed potential jurors that Reynolds was a convicted felon.
On August 10, 2009, the postconviction court held a second Huff hearing and summarily denied claims III, IV, and V. The postconviction court thereafter granted an evidentiary hearing on claims 4, 5, 7, 8, 9, 10, 12, 14, I, and II. After the evidentiary hearing, the postconviction court rendered a final order that denied all of the claims. This appeal followed.
We first address the summarily denied claims and follow with an analysis of the other claims denied after the evidentiary hearing.
Rule 3.851 Proceeding Standard of Review
In determining whether an evidentiary hearing is required on an initial rule 3.851 motion, in Seibert v. State, we held that:
[A] court cannot look beyond the filings. An evidentiary hearing must be held whenever the movant makes a facially sufficient claim that requires a factual determination. {See Amendments to Fla. Rules ofCrim. Pro. 3.851, 772 So.2d 488, 491 n. 2 (Fla.2000) (hereinafter "Amendments I ”) (endorsing the proposition that “an evidentiary hearing is mandated on initial motions which assert ... legally cognizable claims which allege an ultimate factual basis”); see also Fla. R.Crim. P. 3.851(f)(5)(A)(i) (providing that, on initial motions, an evidentiary hearing is required “on claims listed by the defendant as requiring a factual determination”).] On an initial rule 3.851 motion, to the extent there is any question as to whether the movant has made a facially sufficient claim requiring a factual determination, the court must presume that an eviden-tiary hearing is required. See Amendments I, 772 So.2d at 492 n. 2 (stating that adoption of provision addressing ev-identiary hearings is consistent with *471 Court’s endorsement of a presumption in favor of evidentiary hearings on initial postconviction motions raising factually based claims). In other words, a post-conviction claim may be summarily denied only when the claim is “legally insufficient, should have been brought on direct appeal, or [is] positively refuted by the record.” Connor v. State, 979 So.2d 852, 868 (Fla.2007).
64 So.3d 67, 75 (Fla.2010).
The decision of a trial court of whether to grant an evidentiary hearing on a rule 8.851 motion is ultimately based on written materials before the court and its ruling is tantamount to a pure question of law, subject to de novo review. See id. at 75; State v. Coney, 845 So.2d 120, 137 (Fla.2003). This Court will affirm the summary denial of a postconviction claim only when the claim is conclusively refuted by the record. See Seibert, 64 So.3d at 75.
Reynolds contends that his de- ' fense attorneys were ineffective during both the guilt and penalty phases of the trial. Claims of ineffective assistance of counsel are reviewed under the two-pronged standard established in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must establish that the performance of counsel was deficient. See id. at 687, 104 S.Ct. 2052. To do this, the defendant must identify specific acts or omissions that demonstrate the performance of counsel was unreasonable under prevailing professional norms. Hoskins v. State, 75 So.3d 250, 253-54 (Fla.2011). “[Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000). The defendant must show that “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Second, the defendant must establish that the deficit performance of counsel prejudiced the defendant. See id. The defendant must demonstrate that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome” of the trial. See id. at 694, 104 S.Ct. 2052. This Court employs a mixed standard of review when reviewing Strickland claims because the standard presents mixed questions of law and fact. See Anderson v. State, 18 So.3d 501, 509 (Fla.2009). We defer to the factual findings of the postconviction court that are supported by competent, substantial evidence, but review the legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771 (Fla.2004).
Claims Denied Without an Evidentiary Hearing Testimony of FDLE Analyst Charles Badger
Reynolds first alleges that the postconviction court erred in summarily denying the claim that trial counsel were ineffective for their failure to object to or cure the allegedly false testimony of Florida Department of Law Enforcement (FDLE) senior crime laboratory analyst Charles Badger. The trial transcript reflects the testimony of Badger with regard to the DNA testing performed on the vaginal swabs from Christina Razor as follows: “[A]nd those results that were obtained were found to be consistent with Christina Razor and Michael Reynolds. Robin Razor and Danny Privett were excluded from being the donors of the DNA profile observed.” (Emphasis supplied.) In contrast to the words recorded in the written *472 transcript, however, Badger’s report indicated that Reynolds was excluded as a donor of the DNA profile that was derived from the swabs. During the postconviction process, the State filed a motion to correct the record. It attached an affidavit from the court reporter (in addition to a tape recording of the testimony) stating that the transcript should have read as follows: “[A]nd those results that were obtained were found to be consistent with Christina Razor. And Michael Reynolds, Robin Razor and Danny Privett were excluded from being the donors of the DNA profile observed.” (Emphasis in original.) The trial court denied the State’s motion.[2]
In this case, the claim that trial counsel were ineffective for permitting Badger to testify without objection is conclusively refuted by the record. First, after the direct appeal, the State provided the postconviction court with an affidavit from the court reporter at the trial. The affidavit states that the reporter simply misplaced the period in the disputed statement — that it should have been placed before the words “and Michael Reynolds,” thus excluding him as a donor of the DNA found on the vaginal swabs. The affidavit states that the court reporter mistyped the relevant testimony, not that Badger misspoke at trial.
Second, during the postconviction evi-dentiary hearing, one of the defense attorneys testified that he did not object to Badger’s statement because he did not believe that Badger had testified falsely. Rather, counsel testified that he believed that the amended transcript accurately reflected what he had heard at trial-that Reynolds was excluded as a donor of the DNA that Badger derived from the vaginal swabs of Christina Razor. Upon review of a recording of Badger’s testimony,[3] trial counsel confirmed that this was why he did not object at trial. We conclude that the performance of defense counsel was not deficient under Strickland because counsel decided not to object to correct trial testimony. See Williams v. Sec’y, Dep’t of Corr., No. 8:07-cv-591-T-33TBM, 2009 WL 910789, at *10 (M.D.Fla. Apr. 2, 2009) (holding that counsel cannot be considered ineffective for failing to object to a correct statement); Franqui v. Fla., No. 07-22384-CIV, 2008 WL 2747093, at *14 (S.D.Fla. July 10, 2008); Payne v. United States, 546 F.Supp.2d 1312, 1319 (M.D.Fla. 2008).
Third, even if the performance of defense counsel was deficient for not moving to clarify the Badger statement, this failure did not affect the jury’s verdict and thus did not prejudice Reynolds. The State presented testimony that no semen was found on the vaginal swab from Christina. Another FDLE crime laboratory analyst testified that she found no semen on the vaginal, oral, and anal swabs taken from both Christina and her mother, *473 thereby contradicting the allegedly inaccurate statement. Therefore, even if there was some confusion because of the trial testimony from Badger regarding DNA evidence, the other FDLE analyst clearly established that no semen from Reynolds was found inside of Robin or Christina Razor.
Fourth, the report prepared by Badger addressing the results of his DNA analysis of the swabs at issue which were referenced during the testimony contradicts the postconviction claim. This report reflects that DNA from Reynolds was not found in Christina or her mother.
Fifth, the State presented different DNA evidence that linked Reynolds to the crime. During the police investigation following the murders and before Reynolds was formally arrested, Reynolds stated that he had never been in the trailer where the bodies were found. Investigators, however, found substantial DNA evidence connecting Reynolds to the inside of the trailer. Investigators recovered a pubic hair from a towel and pillow found at the crime scene with DNA that matched the known profile of Reynolds.[4] Badger testified that the DNA from that pubic hair matched the known DNA profile of Reynolds to the exclusion of one in thirty quintillion other Caucasians, one in fourteen sextillion African Americans, and one in eighty-seven quintillion Hispanics based on an FDLE database. Based on a different FBI database, this match was to the exclusion of one in thirty-two quintillion Caucasians, one in thirteen sextillion African Americans, and one in sixty-six quintillion Hispanics.
Badger also presented findings that connected the known DNA profile of Reynolds to other items found in and around the trailer. Badger testified that DNA found on underwear located in the trailer matched the known DNA profile of Reynolds to the same statistical exclusion as the pubic hair. Badger also testified that DNA from a blood sample taken from a piece of wood found above an air conditioning unit, and a switch plate from a cabinet, were matches with the DNA profile of Reynolds.
A blanket from the crime scene stained with blood contained DNA that matched the DNA profiles of Robin and Christina Razor and Reynolds. The State presented an extensive amount of DNA evidence to link Reynolds to the crimes which refuted the claim that he had never been in the Razor trailer.
Sixth, although the DNA evidence alone does not establish that Reynolds attempted a sexual battery upon Christina before he killed her, other evidence was available for the State to argue in its closing statement that supported an attempted sexual battery theory. Christina’s underwear was found on the floor of the trailer where she and her mother lived and were killed. Christina’s body was in a nightgown, but not underwear, while Robin was wearing a T-shirt, shorts, underwear, and jewelry. Christina’s grandmother testified that Christina always slept with her underwear on. Therefore, the State’s attempted sexual battery theory is not inconsistent with the facts and evidence presented during trial. See Hodges v. State, 55 So.3d 515, 537 (Fla.2010) (“Attorneys are permitted wide latitude in closing arguments but are not permitted to make improper argument.”) (cert. denied, — U.S. -, 132 S.Ct. 164, 181 L.Ed.2d 77 (2011)); Thomas v. State, 748 So.2d 970, 984 (Fla.1999) (noting that attorneys are permitted to advance all legitimate arguments that derive from logical inferences drawn from the *474 evidence). Thus, we conclude that there is no reasonable possibility that the alleged deficiency to object or cure the purportedly false testimony of Badger affected the jury’s verdict.
In sum, the summary denial of this claim by the postconviction court is supported by the record, which provides evidence to conclusively refute the claim asserted by Reynolds. We further conclude that Reynolds was not prejudiced by a failure to object to the Badger testimony or to the attempted sexual battery theory. Consequently, we deny relief on this claim.
Burden of Proof Misstatement
Reynolds next claims that defense counsel were ineffective for failing to object to a misstatement by the trial court regarding the burden of proof. During voir dire, the trial court incorrectly stated on one occasion that “the State doesn’t have to do anything, you can’t hold it against them.” It appears evident that the trial court meant to instruct the jurors was “the defense doesn’t have to do anything, you can’t hold it against them.” (Emphasis supplied.)
The State claims this issue is procedurally barred and we agree. Although claims of ineffective assistance of counsel generally are not cognizable on direct appeal and are properly raised in postconviction proceedings, see Franqui v. State, 59 So.3d 82, 96 (Fla.2011), this claim is barred. After voir dire had concluded, the State brought the error to the attention of the original trial court.[5] In response, the trial court stated that even if the instruction had been incorrect, he believed that he “drove [the proper burdens] home enough to where [the jury] understands.” This issue, which pertained to a jury instruction during voir dire, could have been, and should have been, raised on direct appeal, and because it was not, is proee-durally barred. Cf. Franqui, 59 So.3d at 96 n. 14. An attempt to circumvent the procedural bar by cloaking this claim in the guise of ineffective assistance, therefore, is to no avail.
Furthermore, even if the claim was not barred, it lacks merit. Reynolds relies on Murray v. State, 937 So.2d 277, 281 (Fla. 4th DCA 2006), in which the Fourth District Court of Appeal deemed the trial judge’s erroneous instruction regarding the burden of proof to be fundamental error. In Murray, the trial judge both orally stated, and provided in written form, an instruction that the defendant carried the burden of proving an affirmative defense beyond a reasonable doubt. See id. at 280. While reading the written instructions to the jury, the judge faltered over the language, and the Fourth District surmised this was because “it must have occurred to the Judge that there is something improbable about a criminal defendant having a burden of proving any de *475 fense beyond a reasonable doubt....” Id.[6] Thereafter, the jury retired to deliberate with the erroneous written instructions and a muddled oral instruction from the judge. See id. The Murray court held that the contradictory and confusing instructions were given in such a way as to define the legal defense of the defendant out of existence and, therefore, the case should be remanded for a new trial. See id. at 280-81. The Fourth District noted that when juries are provided with both correct and incorrect instructions there is “no reason to believe that [the jury is] likely to intuit which is the correct [instruction].” See id. at 280.
This case, however, involves one isolated misstatement of the burden of proof that occurred during voir dire only, and was amongst more than a dozen correct statements regarding the proper burden of proof, which were stated during both voir dire and the trial. Correct statements from the judge regarding the proper burdens included:
Presumptions have long been a part of criminal law. The presumption of innocence is such an example. Our system of justice is accusatorial in nature. That means that the State has the power to accuse, and the responsibilities to prove, a charge against the Defendant. As a result, a defendant is presumed innocent until proven guilty beyond a reasonable doubt.
Do you agree with the principle of law that a person is presumed to be innocent until proven guilty beyond a reasonable doubt?
I always ask the State in the presence of all the members of the panel, if they accept the burden of proving the case beyond and to the exclusion of a reasonable doubt? This case is no different. Mr. Hastings, does the State of Florida accept the burden of proof beyond and to the exclusion of a reasonable doubt? ... And to that extent, let me go a little bit further. You [the jury] need to answer out loud to these questions. Does everybody understand that it is the State’s responsibility to prove the case.... Does everybody understand the Defense doesn’t have to prove anything?
(Emphasis supplied.)
The State also correctly addressed the burden of proof. Such statements included:
[E]ach of the crimes in the State of Florida, no matter what they are, whether it’s a shoplifting or first degree murder, have certain number of elements, and each of those elements, the Judge told you, has to be proven beyond a reasonable doubt.
And you all indicated that before you would find the Defendant guilty, you would make sure that the State proved those elements beyond a reasonable doubt.
Now, the burden of proof, as you’ve heard and everything, in a criminal case, it doesn’t matter whether it’s a shoplifting case or a first degree murder case, is beyond a reasonable doubt.... Do you feel that’s [an] appropriate burden?
Correct statements from defense counsel regarding the burden of proof included:
Do you [the jurors] believe he, in fact, should be presumed to be innocent?
That presumption stays with Mr. Reynolds until such time, if any, that the *476 State Attorney's office proves beyond a reasonable doubt that it should go away; that, in fact, he was guilty. Do you understand that?
In a criminal case, the burden of proof is much different, it’s beyond each and every reasonable doubt. Standard is much higher. Do each of you accept that that standard is much higher?
Throughout closing statements, the State and the defense addressed the burden of proof, reasonable doubt, and the presumption of innocence multiple times. For each count with which Reynolds was charged, the judge correctly instructed the jury on the burden of proof and reasonable doubt.
Moreover, defense counsel was not ineffective with regard to redressing the misstatement of law. First, the State brought the one misstatement to the attention of the trial judge and defense counsel asked the judge to correct the misstatement. Defense counsel was not deficient because he requested a correction. Second, Reynolds has not shown that this misstatement prejudiced him. Given the fleeting nature of the misstatement, that it occurred only once and during voir dire, and the numerous references to the correct allocation of the burdens of proof, we disagree with Reynolds that the jury would have been misled or confused as to which party carried the burdens of proof when they retired to deliberate. See Rodriguez v. State, 27 So.3d 753, 756 (Fla. 3d DCA 2010) (holding that the prosecutor’s misstatement regarding the burden of proof did not constitute fundamental error and affect the fairness of the trial where the misstatement “occurred only once, during closing argument”); Henyard v. State, 689 So.2d 239, 250 (Fla.1996) (holding that the trial court’s error in instructing jurors during voir dire regarding aggravators, mitigators, and the death penalty was harmless where error occurred only three times during voir dire and it was not repeated by the trial court during the penalty phase). Thus, both requirements of Strickland fail in this case.
We affirm the posteonviction summary denial of this claim.
Lay Witness Testimony: Hand Injury
Reynolds next asserts that the postcon-viction court erred in summarily denying the claim that trial counsel were ineffective because they failed to object to impermissible lay witness testimony. During the trial, a videotape of an interview between Sheriffs Deputy John Parker and Reynolds was presented to the jury. During the interview, Reynolds described his hand injury to Parker. Reynolds stated that he had slipped on the exterior step of his trailer and, in an attempt to break his fall, grabbed the door and cut his hand on a burr on the aluminum frame. Thereafter, Reynolds stated he drove himself to the hospital for treatment. After he returned from the hospital, he removed the burr from the door frame with channel-lock pliers. During trial, Parker testified that he and another detective visited the trailer and found the burr on the ground near the door. The challenged testimony is as follows:
PROSECUTOR 3: Now, you said that the Defendant told you that he used channel locks and a screwdriver to remove what he termed as a burr; correct?
PARKER: Correct.
PROSECUTOR 3: And from your examination [of] that V notch,[7] from your experience, ... did you believe that?
PARKER: No, I did not.
PROSECUTOR 3: Why not?
*477 PARKER: Because as I said earlier, the entire notch was nice and shiny. If it had been cracked and a piece of it sticking out, first place, it would have to be really sticking out to cut his finger like that, in my opinion. Secondly, it would have been gray somewhere in that crack. And the piece that we found and the entire notch that it went to is nice and shiny as though it had just been created.
PROSECUTOR 3: Now he had already come up with that explanation at that time when you were out there, did he not?
PARKER: Yes.
Reynolds contends that defense counsel were ineffective because they failed to object to this testimony on the grounds that Parker was not qualified to testify as an “expert in metallurgy or the rate of oxidation of aluminum.” The State contends that an expert is not required to testify as to “whether or not a piece of metal would be shiny if recently cut.”
Section 90.701, Florida Statutes (2011), provides:
If a witness is not testifying as an expert, the witness’s testimony about what he or she perceived may be in the form of inference and opinion when:
(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness’s use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
(2) The opinions and inferences do ?iot require a special knowledge, skill, experience, or training.
§ 90.701, Fla. Stat. (2011) (emphasis supplied).
Reynolds relies on the decision in Nar-done v. State, 798 So.2d 870 (Fla. 4th DCA 2001), to support this claim. Nardone, however, suggests that it was not necessary to admit the witness in this case, Parker, as an expert. In Nardone, the court held that the trial court abused its discretion when it allowed the State to introduce the opinion of a police officer regarding whether an aluminum strip torn from a planter could be a weapon. See id. at 874. The Nardone court explained that lay witness opinion testimony is permitted only when it is based on what the witness has personally perceived. See id. at 873. Since the testifying officer’s conclusion was not based on eyewitness testimony of the assault that had purportedly transpired with the strip, the district court concluded the testimony was speculative and impermissible lay opinion. See id. It distinguished its decision from those in Floyd v. State, 569 So.2d 1225 (Fla.1990), and Peacock v. State, 160 So.2d 541 (Fla. 1st DCA 1964), in which this Court and the First District, respectively, admitted opinion testimony from law enforcement. In Floyd, this Court held that the trial court did not abuse its discretion when it admitted the testimony of a police officer regarding the impressions of what occurred at a crime scene. See 569 So.2d at 1232. In that case, a police officer testified “that a tablecloth found lying on the bed ‘appeared like someone had taken some type of object that had blood on it and wiped it on there-’” See id. at 1231. That same officer testified that a tissue box lying on the floor appeared to have been knocked off a dresser. See id. We affirmed the admission of this testimony and noted that the officer’s “testimony [was] within the permissible range of lay observation and ordinary police experience.” Id. at 1232.
In Peacock, the First District held that an officer was permitted to testify with regard to his visual comparison of tires *478 and casts made from tire prints found at the scene of the crime. See 160 So.2d at 542-43. The Peacock court stated that a witness does not need to be specially trained to make the type of visual comparison at issue in that case, and concluded that “an intelligent person with some degree of experience ... may and should be permitted to testify, leaving to the jury ... the determination of the credence and weight to be given thereto.” Id. at 548.
Here, Parker testified as to his observations of the burr and his impression of what should have been found. Based on the statements from Reynolds, Parker testified that he believed a piece of the burr should have “really [been] sticking out to cut [Reynolds’] finger.” The door and metal burr were available during trial for the jury to personally examine. The door was in the courtroom and the burr was admitted into evidence. The jury members, therefore, could make their own “determination of the credence and weight to be given” to the testimony from Parker. See Peacock, 160 So.2d at 542-43.
Additionally, we conclude that the testimony was “within the permissible range of lay observation.... ” See Floyd, 569 So.2d at 1232. Parker testified that he thought the burr looked too “nice and shiny,” that it should have been grayer, and that if the cuts Reynolds sustained were actually from contact with the burr, the burr would have had a sharper edge, or, as Parker reasoned, a piece of the burr would have been “really sticking out.” Counsel was not deficient for failing to object to this testimony as it falls within the range of lay observation permitted by Florida law.
Furthermore, even if the testimony from Parker was impermissible and could only have been provided by one who specializes in the study of metals, this claim is still without merit because Reynolds has not met the second of Strickland’s two required prongs: prejudice. Reynolds has failed to show that but for the alleged deficiency of counsel, our confidence in the outcome of the proceeding would be undermined. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Bolin v. State, 41 So.3d 151, 155 (Fla.2010). Indeed, this challenge is almost completely tangential to a determination of guilt in this case.
The State introduced a significant amount of DNA evidence during trial which linked Reynolds to the crime scene. As addressed in the first claim, the State presented evidence demonstrating that Reynolds’ DNA was found on underwear, a blanket and towel, and a piece of wood in the Razor trailer. This DNA evidence was in addition to statements from Reynolds to law enforcement concerning an altercation he had with Danny Ray Privett, eyewitness testimony of Privett sitting on Reynolds’ car which was parked at the crime scene the night the crimes were committed, eyewitness testimony of Reynolds washing clothes at 5:30 a.m. on the morning the bodies were discovered, clothes found on a clothesline belonging to Reynolds that appeared to have been bleached, and testimony from two prisoners who had previously been incarcerated with Reynolds to whom he admitted committing the crimes. Furthermore, the State provided expert testimony as to the cause of Reynolds’ hand injury, which suggested that it was not from falling and catching his hand on a metal burr. A medical examiner testified that the hand injury most likely was from a knife, or a similarly long and sharp object.
Given the copious amount of evidence connecting Reynolds to the crimes, irrespective of the testimony from Parker regarding the metal burr, we conclude that Reynolds has not satisfied the requirements of Strickland. Accordingly, we af *479 firm the denial of relief on this claim by the postconviction court.
Lay Witness Testimony: Clothing Condition
At trial, two witnesses testified with regard to incriminating clothing. Reynolds contends that his counsel were ineffective because they permitted his landlady to testify with regard to the condition of his clothing as it was found on the day of the homicides. Based on the record, however, it was the crime scene investigator, not the landlady, who testified as to the condition of the clothing. The contested testimony is as follows:
PROSECUTOR 3: Okay. Now, clothes, did you see any clothes that appeared to have been washed—
INVESTIGATOR: Yes.
PROSECUTOR 3: — recently? And tell us about that.
INVESTIGATOR: There was a clothesline approximately fifty feet from where the washing machine was, and it was full of clothing that had been washed.
PROSECUTOR 3: Were these men’s clothes or women’s clothes?
INVESTIGATOR: Men’s clothes.
PROSECUTOR 3: Anything that appeared to be significant about any of those clothes?
INVESTIGATOR: They appeared to be bleached, strongly bleached. They were very faded.
The claim that his attorneys were ineffective for their failure to object to this testimony is premised on the assumption that a non-expert was permitted to offer expert testimony. Reynolds contends that a layperson should not be permitted to testify whether clothing provides an appearance as though it has been bleached. Given that it was an individual trained in crime scene investigation and documentation, and not a landlady, who testified as to the state of this clothing, we note that the claim is weaker than either of the parties recognized. The investigator was not admitted as an expert and, according to Reynolds, the individual who testified offered expert conclusions. We address the argument as if it was directed to the investigator rather than to the landlady — neither of whom were qualified as bleach experts.
Reynolds claims that the investigator should not have been permitted to testify regarding the state of his clothing because she “lacked the special knowledge, experience, skill or training required to express an opinion as to whether the condition or makeup of [his] clothing showed that it had been bleached.... [The investigator] had no chemical or business background allowing her to render an opinion” -with regard to the state of his clothes.
This asserted expert issue is a non-issue because it is immaterial. Whether clothes appear to have been bleached is an observation within the province of a lay witness. As addressed in the previous claim, lay witnesses can provide opinion-type testimony if it is “within the ken of an intelligent person with a degree of experience.” Floyd, 569 So.2d at 1232. An opinion as to whether clothes appear to be bleached does not require “any special knowledge, skill, experience, or training,” see Williams v. State, 70 So.3d 733, 735 (Fla. 4th DCA 2011), and would be within the knowledge of an average person who has washed and bleached clothing. The type of testimony here was not a chemical analysis. Therefore, trial counsel were not deficient in their failure to object to the testimony concerning the impression of the clothing on the day of the murders.
Moreover, even if counsel were deficient in failing to object to this specific testimony, based on the extensive DNA evidence and testimony presented at trial, the error *480 was not prejudicial to the extent that it undermines our confidence in the outcome of this case. Therefore, we affirm the summary denial of this claim by the postcon-viction court.
Sleeping Juror
Reynolds contends that trial counsel were ineffective for not seeking to remove a sleeping juror because she fell asleep during “critical testimony.” The juror first fell asleep during the testimony of an evidence specialist, and later during the testimony of forensic analyst Charles Badger. The record reflects that the juror fell asleep when the evidence specialist was discussing packaging evidence from the crime scene for scientific analysis and processing. Noting the sleeping juror, the trial judge requested that the State and defense approach the bench to discuss the issue. Following the bench conference, the trial judge had the testifying specialist pause her testimony, admonished the juror outside the presence of the whole jury, and then resumed the trial. Later, during Badger’s testimony, the trial judge again called a bench conference, excused the jury, and discussed the conduct of the juror with the State and defense. The trial judge commented that the juror was distracting others with her dozing. After a lunch recess, the trial judge asked the parties to readdress the issue. The State did not make any specific request to have the sleeping juror removed, and the defense confirmed that they wanted her to continue as a juror.
Reynolds asserts that the court erred by not holding an evidentiary hearing on this claim. We affirm the denial of this claim because the sleeping juror issue was fully addressed during trial. Furthermore, Reynolds has failed to show that he suffered undue prejudice as a result of the behavior of the juror. The record conclusively refutes the claim that trial counsel were ineffective because they did not request the removal of this juror.
Florida courts have reversed and remanded summary denials of claims involving the failure of trial counsel to bring a sleeping juror to the attention of the court. In Terrell v. State, 9 So.3d 1284, 1290 (Fla. 4th DCA 2009), for example, the Fourth District held that the defendant presented a “legally and factually sufficient” claim that defense counsel failed to object to a sleeping juror and the postconviction court erred in summarily denying the claim. See also Judd v. State, 951 So.2d 103, 104 (Fla. 4th DCA 2007); Erlsten v. State, 842 So.2d 967, 968-69 (Fla. 4th DCA 2003); McClendon v. State, 765 So.2d 247, 248 (Fla. 1st DCA 2000); Reside v. State, 448 So.2d 644, 644 (Fla. 4th DCA 1984). The Terrell court, accordingly, reversed and remanded for an evidentiary hearing on this claim. See 9 So.3d at 1290. Conversely, the Fourth District has also affirmed the denial of sleeping juror claims when trial counsel has brought the problem to the attention of the trial court, thereby “conclusively refutfing] the allegations of ineffectiveness.” See Prince v. State, 40 So.3d 11,12 (Fla. 4th DCA 2010).
The transcript from this trial indicates that the court brought this issue to the attention of all involved. In Terrell, the trial court erred in summarily denying the claim because the sleeping juror situation was not addressed at trial — thus, addressing this problem at trial was the issue. See 9 So.3d at 1290; see also Wilson v. State, 828 So.2d 1086, 1086-87 (Fla. 1st DCA 2002) (reversing and remanding the summary denial of a claim of ineffective assistance of counsel because trial counsel failed to notify the court that a juror was sléeping during critical testimony). In this case, however, this situation was discussed, although it was the court that first addressed the issue. If the issue is correctly *481 addressed, no reversible error is presented.
The issue with regard to trial counsel waiving objection to the removal of the juror, however, is a separate claim. In Simo v. State, the Fourth District stated that trial counsel may be ineffective for “waiving objection to the presence of a sleeping juror.” 790 So.2d 1190, 1191 (Fla. 4th DCA 2001) (holding the trial court erred in summarily denying the claim of ineffective assistance for “failing to object and in waiving objection to the presence of a sleeping juror”); see also McGraw v. State, 796 So.2d 1205, 1206 (Fla. 4th DCA 2001) (noting that it is “usually improper to summarily deny a claim that counsel failed to act upon being informed that a juror was sleeping during trial”). In this case, defense counsel did not request the removal of the sleeping juror. Whether trial counsel had a tactical or strategic reason for not pursuing the dismissal of the juror is a determination that usually should require an evidentiary hearing. See Erlsten, 842 So.2d at 968-69. Here, however, we conclude that the colloquy that transpired during trial between the court and trial counsel over the course of two separate bench conferences produced sufficient information and evidence to render an evidentiary hearing and further inquiry unnecessary.
During the first bench conference, the trial court asked both the State and defense counsel whether they wanted the juror to remain on the panel. At that time, the juror was observed dozing during what would be considered inconsequential testimony. An evidence specialist was simply listing the items she had collected, confirming that these items were labeled, and addressing security at the crime scene. Although the State did not make a specific request with regard to the juror, State counsel was concerned with keeping the juror on the panel and expressed a willingness to replace the juror if defense counsel requested a removal. Defense counsel specifically stated that they would prefer that the court not remove the juror, and instead discuss the situation with the subject juror. The trial court, in response, addressed the issue and admonished the juror.
During the second bench conference to discuss this juror’s behavior, State witness Badger was presenting testimony which addressed the processing of DNA samples recovered from the crime scene. The record reflects that Badger was discussing DNA matches, and the lack thereof, from Reynolds to items associated with the crime. Before the trial court again noted the dozing juror, Badger testified regarding whether DNA from Reynolds was found on vaginal swabs from Christina Razor. Indeed, if Badger had testified that DNA from Reynolds was found on the swabs as Reynolds contends, then the juror at issue fell asleep during highly incul-patory testimony, and defense counsel decided not to have the juror removed for strategic reasons. Following these two incidents, the juror was not addressed or admonished again and there is no indication that the issue arose again.
The record reflects that the court asked both the State and defense counsel to fully consider their positions with regard to the sleeping juror. The State indicated that it was not making “any specific request of the Court at this time,” and defense counsel stated to the trial court that “we want her to continue as a juror.” The strategic decision is clear. Reynolds now contends that his trial counsel misstated his position and that he wanted the juror removed. The trial transcript also reflects that the court directed defense counsel to speak *482 with Reynolds regarding the decision,[8] and although Reynolds did not personally respond, his counsel did so on his behalf. If Reynolds did not agree with the response of his attorney, which indicated that they wanted to keep this juror on the panel, Reynolds did not make his position known when the opportunity arose. It must be assumed that Reynolds would have indicated his disapproval at that time, in some fashion, during the specific discussion in his presence regarding this issue. Consequently, we affirm the summary denial of this claim by the postconviction court.
Criminal Conduct and the Right to Testify
Reynolds presents a number of issues under this claim. We address each, and affirm the summary denial by the postcon-viction court. First, Reynolds states that his counsel were ineffective because they informed the jurors of his prior criminal convictions during voir dire and, during opening statements, twice informed jurors he would testify, but never prepared him to do so. He claims that if he had been prepared, he would have testified as to the source of his injuries, why he was cooperative with the police, that he had always maintained his innocence, that he had a friendly relationship with Danny Privett, that he did not kill the victims, and that he could explain inconsistencies in the evidence. Reynolds claims that his DNA was found inside the trader on a towel that belonged to him and was mishandled during a search of his residence that he authorized. However, whether the towel was, in fact, from Reynolds’ home and mishandled does not explain away that his DNA was also found on a piece of wood in the Razor trailer or on underwear also recovered from the trailer.
Further, Reynolds does not specifically address the manner in which counsel failed to prepare him to testify — rather, he just states a conclusion that counsel was ineffective. This claim is insufficiently pled. See Wyatt v. State, 78 So.3d 512, 521 n. 6 (Fla.2011) (denying claims as insufficiently pled in part because counsel failed to specifically address what was allegedly erroneous or what counsel should have done instead); Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997) (noting that the defendant’s failure to fully brief and argue his claims constituted a waiver of those claims). Nevertheless, even if we accept this claim that his counsel was deficient in this regard, Reynolds does not set forth the manner in which this failure ultimately prejudiced his case which would “undermine judicial confidence in the outcome” of his trial. See Lawrence v. State, 831 So.2d 121, 129 (Fla.2002) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). It should be noted that Reynolds ultimately decided not to testify at trial,
Second, Reynolds contends that he felt threatened by his counsel because defense counsel informed him that if he testified it would “f* *king kill him.” Although perhaps this is a poor choice of words, this statement itself does not indi *483 cate that defense counsel threatened Reynolds and thereby coerced his silence. Nor do such words connote, as Reynolds alleges, that if he testified, he would definitely receive the death penalty. Rather, the statement suggests that counsel believed it would be poor strategy and detrimental to the case if Reynolds testified during trial. Indeed, the postconviction court stated in the denial order that given the expectation of trial counsel that Reynolds would testify, “it was not unreasonable for counsel to ‘take the wind out of the sails’ of that basis for impeachment by bringing out [prior convictions] during voir dire. The fact that the strategy evolved during the course of the trial does not retroactively render the decision unreasonable.”
As this Court has indicated time and again, counsel will not be found ineffective for decisions that “in hindsight, did not work to the defendant’s advantage.” See Souffrant v. State, 994 So.2d 407, 410-11 (Fla. 3d DCA 2008) (citing Mansfield v. State, 911 So.2d 1160, 1174 (Fla.2005)); see also Strickland, 466 U.S. at 689, 104 S.Ct. 2052; Mendoza v. State, 87 So.3d 644, 655 (Fla.2011); Everett v. State, 54 So.3d 464, 478 (Fla.2010); Anderson v. State, 18 So.3d 501, 509 (Fla.2009). Review of ineffective assistance of counsel claims must be from the perspective of defense counsel at the time of trial rather than with the “heightened perspective of hindsight.” See Patton v. State, 784 So.2d 380, 391 (Fla.2000). Indeed, “£j]udi-cial scrutiny of counsel’s performance must be highly deferential.” Strickland, 466 U.S. at 689,104 S.Ct. 2052. Reynolds may have benefitted from testifying, but the record indicates that during the trial Reynolds decided against that approach. This decision does not render his trial counsel ineffective.
Third, Reynolds claims that the trial court failed to ask him whether his decision not to testify was voluntary and knowing. When the time arrived for Reynolds to testify, the following colloquy occurred:
THE COURT: [Defense counsel], have you figured out what the order of trial is gonna be for this afternoon, sir? DEFENSE: Judge, we’re gonna rest at this time.
THE COURT: Okay. Mr. Reynolds, like I said before, this would be the time when in the trial if you wanted to testify where you would be able to testify. If you want to testify, that’s fine, your testimony is considered by the same standard as any other witness. If you don’t want to testify, that’s fine, it can’t be held against you. As I said before, you should naturally listen very carefully to your attorneys whenever they advise you as far as this particular matter, but again, this is your case, your life, so to speak, you make the final decision.
REYNOLDS: Yes, sir.
THE COURT: Knowing that — You’ve spoken to your attorneys about this; is that correct?
REYNOLDS: Yes, sir, I have.
THE COURT: And have you reached a decision whether you want to testify or not testify?
REYNOLDS: Yes, sir.
THE COURT: And what is your decision, sir?
REYNOLDS: No, I don’t want to testify-
The Court: And you understand that this is the one time of the trial where basically you’d be able to if you wanted to?
REYNOLDS: Right.
THE COURT: And is this your personal decision?
*484 REYNOLDS: Yes, sir.
THE COURT: Then well abide by that. So you’re gonna rest at this time? DEFENSE: Yes, sir.
This evidences that indeed a colloquy was conducted, and Reynolds is essentially arguing that the trial court should have engaged in a more detailed discussion than that which actually occurred during the quoted exchange. Reynolds contends that his counsel were ineffective because they misadvised him with regard to testifying, and in doing so, coerced him into silence. Reynolds also asserts that he is entitled to an evidentiary hearing to further investigate this claim.
The right to testify is a “fundamental right[ ] under our state and federal constitutions.” See Deaton v. Dugger, 635 So.2d 4, 8 (Fla.1993). “[T]he record must support a finding that such a waiver was knowingly, voluntarily, and intelligently made.” Id.; see also State v. Lewis, 838 So.2d 1102, 1112 (Fla.2002). In Gonzalez v. State, this Court held that the defendant had knowingly, voluntarily, and intelligently waived his right to testify. See 990 So.2d 1017, 1031 (Fla.2008). After counsel had informed the trial judge that the defendant would not be testifying, the trial court conducted a colloquy with the defendant which addressed that he
understood that he had a constitutional right to testify even if his counsel believed that he should not[,] ... that he was going to follow his counsel’s advice to not testify, ... that it was his personal decision not to testify, and counsel did not promise him anything or force him into not testifying.
See id. at 1031-32. The Gonzalez Court noted that
[although this Court has held that “a trial court does not have an affirmative duty to make a record inquiry concerning a defendant’s waiver of the right to testify,” this Court has stated that ... “it would be advisable for the trial court ... to make a record inquiry as to whether the defendant understands he has a right to testify.... ”
Id. at 1031 (quoting Torres-Arboledo v. State, 524 So.2d 403, 411 n. 2 (Fla.1988)).
The colloquy that occurred between Reynolds and the trial court did not specifically address two elements that were present in Gonzalez: whether counsel promised anything or forced the defendant not to testify, and whether the defendant knew that he had a constitutional right to testify. Despite these omissions, we are satisfied that the trial court obtained a knowing, voluntary, and intelligent waiver from Reynolds of his right to testify as demonstrated by the quoted exchange.
Moreover, there is no mandate that a trial court conduct a “Faretto-type inquiry” to accept a defendant’s decision to waive his Fifth Amendment right to testify. In Faretta v. California, 422 U.S. 806, 809-10, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), despite a particularly searching inquiry, the trial court did not accept the decision of the defendant to conduct his own defense and waive his right to counsel. The United States Supreme Court vacated the judgment of the trial court and held that the defendant had been deprived of his constitutional right to self-representation. See id. at 836, 95 S.Ct. 2525. Since Faretta, courts have interpreted the case to require that they conduct a sufficiently searching inquiry when evaluating whether a defendant has knowingly, voluntarily, and intelligently waived his right to counsel. With regard to the right to testify, however, this inquiry need not rise to the Faretta level; it must only indicate that the defendant knowingly, voluntarily, and intelligently waived his right. See Deaton, 635 So.2d at 8.
*485 The waiver by Reynolds was expressed on the record even though this Court has held that it is not necessary to do so. See Lawrence v. State, 881 So.2d 121,132 (Fla. 2002) (holding that the trial court need not obtain defendant’s waiver of his right to testify on the record to ensure that his waiver was knowing and intelligent). Reynolds confirmed with the trial court that his decision not to testify was his own, that he understood now was the time to testify if he so desired, that he discussed his decision with his attorneys, and that he personally decided against it. This claim that the trial court did not question Reynolds regarding his decision not to testify is conclusively refuted by the record. We agree with the denial of this claim by the postconviction court.
Fourth, Reynolds alleges that defense counsel failed to effectively challenge the jailhouse witnesses and that, if he had testified, he could have explained the situation with regard to these witnesses. Reynolds does not provide any insight as to what information could have been discovered by counsel, or the manner in which this evidence could have helped his defense. Additionally, this claim is not specifically alleged, and thus was properly summarily denied. See Troy v. State, 57 So.3d 828, 834 (Fla.2011) (“A court may summarily deny a postconviction claim when the claim is legally insufficient, pro-eedurally barred, or refuted by the record.”); Franqui, 59 So.3d at 95-96.
Reynolds alleges, in passing, that the trial court did not perform a sufficiently searching inquiry with regard to his decision to waive mitigation. There is no argument, analysis, or elaboration with regard to this issue. Reynolds has, consequently, waived this claim. See Duest v. Dugger, 555 So.2d 849, 851-52 (Fla.1990) (The defendant “seeks to raise eleven other claims by simply referring to arguments presented in his motion for postconviction relief. The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.”).
Furthermore, this claim also fails on the merits and was properly summarily denied. The record demonstrates that Reynolds filed, and the court granted, a Waiver of Right to Present Mitigation Evidence. The trial transcript demonstrates that the court engaged in a colloquy with Reynolds with regard to his decision to waive the presentation of mitigation evidence.[9]
*486 Before the penalty phase, the court verified with Reynolds that he did not want to present mitigation. Reynolds stated that he had been in prison all his life, and “[m]y mitigating is not nothing compared to the aggravators that the State is gonna bring in here against me.” Reynolds stated that he did not want to present mitigation evidence and wanted to proceed as quickly as possible to the Spencer[10] hearing “because there’s no such thing.... It’s a waste of time because I have none. I’ve been locked up all my life.”
After the State presented evidence during the penalty phase, the trial court again questioned Reynolds with respect to his decision not to present mitigating evidence. The court then recessed, instructing Reynolds to again consider his decision overnight. The next day, the court asked Reynolds again if he wanted to present mitigating evidence. Reynolds responded that he only wanted to address the court and the victims’ families, to which the court explained that Reynolds could express such sentiments at the Spencer hearing, not the penalty phase. Reynolds thereafter reconfirmed his decision not to present mitigating evidence. This in-depth exchange between the trial court and Reynolds conclusively refutes the claim that trial counsel were somehow ineffective for not presenting mitigation evidence. The postconviction court properly summarily denied this claim.
Lethal Injection
This Court has consistently rejected constitutional challenges to lethal injection. See, e.g., Valle v. State, 70 So.3d 580, 541 (Fla.2011), cert. denied, — U.S. -, 132 S.Ct. 1, 180 L.Ed.2d 940 (2011); Mosley v. State, 46 So.3d 510 (Fla.2009), cert. denied, — U.S. -, 131 S.Ct. 219, 178 L.Ed.2d 132 (2010); Ventura v. State, 2 So.3d 194 (Fla.2009), cert. denied, — U.S. -, 129 S.Ct. 2839, 174 L.Ed.2d 562 (2009); Tompkins v. State, 994 So.2d 1072 (Fla.2008), cert. denied, 555 U.S. 1161, 129 S.Ct. 1305, 173 L.Ed.2d 483 (2009); Lightbourne v. McCollum, 969 So.2d 326 (Fla.2007), cert. denied, 553 U.S. 1059, 128 S.Ct. 2485, 171 L.Ed.2d 777 (2008). This claim, therefore, has no merit, and we affirm the denial of the request for an evidentiary hearing.
Claims Denied After the Evidentiary Hearing
In reviewing a decision of the postcon-viction court to deny claims after an evi-dentiary hearing we review the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence. See, e.g., Hurst v. State, 18 So.3d 975, 993 (Fla.2009); Green v. State, 975 So.2d 1090, 1100 (Fla.2008); Melendez v. State, 718 So.2d 746, 747-48 (Fla.1998). We review the trial court’s application of the law to the facts de novo. See Green, 975 So.2d at 1100; Arbelaez v. State, 898 So.2d 25, 32 (Fla.2005).
*487 Closing Statement: Attempted Sexual Battery
Reynolds contends that his trial counsel were ineffective for failing to object to the State’s remark during closing statements that “Reynolds’ motive was the attempted sexual battery of an 11-year old.” The denial of this claim by the post-conviction court is supported by competent, substantial evidence. Thus, we affirm its ruling.
The following evidence was presented during the trial: Christina’s grandmother testified that Christina usually slept with her underwear on and identified a Rugrats sleeping bag[11] as belonging to Christina. Another witness, and friend of the three victims, testified that she too recognized the Rugrats item as something Christina slept with every night. During trial, a DNA lab analyst testified that he analyzed the underwear recovered from the crime scene and found blood from Christina on them. A medical examiner testified that Christina was found not wearing any underwear.
In closing, the State asserted the following:
Christina always slept with her panties ... and always slept with this Ru-grats blanket. However, when the investigators came inside, they found her panties were removed and panties on the floor and the Rugrats blanket removed from her....
Christina’s panties were removed, indicative that the perpetrator had other things on his mind other than just killing Christina....
[T]here’s several stains found on these panties.... [A]s you might expect, a bloodstain of Christina, one was a bloodstain of Robin, and the other was a mixture ... a mixture of that of Christina and the Defendant, Michael Gordon Reynolds.
[W]e know that Christina’s panties were removed, no sperm found on her, but we know, from the evidence, the evidence certainly is suggestive that the Defendant had other thoughts in mind, you might look for some evidence that the Defendant went beyond just thinking about this, and you might look for pubic hair, and, indeed, the hairs were found, collected, and as we talked earlier, whose pubic hair was found right near the little girl, right near the panties, that of the Defendant, matched to the Defendant with DNA....
[T]he perpetrator in this case, the Defendant, didn’t follow through, as evidenced by the fact there was no sperm, no semen found on or about this little girl’s body, is indicative of the fact that something caused him to want to leave quick. He was spooked.
In support of his claim, Reynolds relies on the Second District Court of Appeal’s decision in Coverdale v. State, 940 So.2d 558, 560 (Fla. 2d DCA 2006), in which that court held the trial court abused its discretion in denying a motion for mistrial when a witness, in response to a question regarding a friend’s feelings, stated that the friend “was okay with [the defendant] until he tried to molest her daughter.” The Coverdale court held that the trial court should have declared a mistrial because “[f]ew criminal allegations would be more prejudicial to a defendant than molesting a child. If the jury believed the statement that [the defendant] was a child molester, this gratuitous statement would deny him a fair trial on the aggravated stalking charge, and no curative instruction” would *488 rectify that situation. Id. at 561. However, the Coverdale opinion did not identify any evidence presented during the trial that would have supported an assertion that the defendant actually molested children. In the present case, in contrast, the State provided facts in evidence to support its inference.
During the evidentiary hearing, defense counsel testified that he did not object to the contested closing remark because he regarded it as a permissible inference based on the evidence presented.[12] To find the performance of trial counsel deficient, Reynolds must have established that counsel’s assessment was so unreasonable that he essentially was not functioning as counsel, thus satisfying the first prong of Strickland. See Strickland, 466 U.S. at 700, 104 S.Ct. 2052; see also Occhicone, 768 So.2d at 1048. Based on the evidence presented, we conclude that the statements from the State in closing were not unreasonable or without support in the evidence, and counsel, therefore, were not deficient for failing to object.
Reynolds also fails to satisfy the second prong of Strickland by demonstrating that, had defense counsel objected, the trial court would have sustained any objection. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Given that the State presented evidence supporting an inference of attempted sexual battery, including DNA evidence on Christina’s underwear, our confidence in the outcome of the proceeding is not undermined. Reynolds, therefore, fails to meet either prong of Strickland.
The postconviction court correctly found that trial counsel were not ineffective and its conclusion is supported by competent, substantial evidence. Therefore, we affirm the denial of this claim.
Sexual Battery Motive and HAC
Reynolds claims that defense counsel were ineffective during the penalty phase for three reasons. First, he contends they were ineffective because they did not object to the sexual battery motive argument presented by the State in closing, and because they failed to effectively rebut this theory during closing statements. Second, Reynolds contends that his counsel were ineffective because they did not address the claim that Christina’s death was heinous, atrocious, or cruel (HAC). The only argument advanced was that the sexual battery motive did not support the aggra-vator that the murders were committed to avoid arrest. Third, Reynolds contends that the failure to rebut the testimony of forensic analyst Badger regarding the identification of the DNA profile found on the vaginal swab from Christina prejudiced him during the penalty phase.
Reynolds fails to identify any objectionable statements in the record. Reynolds also does not explain the manner in which a failure to object prejudiced his case except to reiterate the statement in Cover-dale from the Second District that allegations of child molestation are amongst the most prejudicial comments that can be stated. See 940 So.2d at 561. Regardless, the conclusion from the postconviction court that trial counsel did not perform *489 ineffectively because the State’s closing remarks were a fair comment on the evidence, as addressed in the prior claim, is supported by competent, substantial evidence.
With regard to the HAC claim, the State suggests that Reynolds’ allegation may be directed to closing argument when the State commented that Christina suffered defensive wounds, contusions to her face, injuries to her mouth, and also stated:
You couple that with the removal of her panties and we know the last few moments of Christina’s life, first with the realization that her mother was being brutally attacked by this Defendant, and then the last few moments of her life were really indescribable.
On direct appeal, this Court held that the HAC aggravator was supported by competent, substantial evidence. We stated that:
With regard to Christina Razor, the trial court made the following findings:
a. Dr. Sarah Irrgang, the medical examiner, testified that the victim Christina Razor, suffered two stab wounds to the neck and shoulder area, contusions to her face, and injuries to her mouth. It was Dr. Irrgang’s testimony that Christina Razor also suffered an abrasion on the back of one of her hands which was characterized as being consistent with a defensive wound.
b. The presence of defensive wounds allows the assumption to be made that the victim was alive unless shown otherwise by the evidence.
c. The existence of a defensive wound demonstrates that the victim was aware of her plight and was [resisting]. The stab wounds suffered by the victim, Christina Razor, are consistent with having been made with a weapon such as a knife.
d.At the moment that the victim, Christina Razor, was being attacked, it is not known whether or not her mother was still alive and conscious or unconscious or had been murdered. Regardless, in the close confines of that cramped camping trader, Christina Razor, in great pain and fear, was forced to fight a losing battle for her life knowing that either her mother had already been killed and she was next or that after Reynolds killed her, he was sure to end her mother’s life. For a child to experience the fear, terror and emotional strain that accompanied Christina Razor as she fought for her life, knowing full well that she was fighting a losing battle, is unimaginable, heinous, atrocious and cruel....
Reynolds, 934 So.2d at 1154.
As noted in the opinion of this Court, a vast amount of evidence supported the HAC argument. Moreover, as addressed in the prior claim, the State’s inferences regarding sexual battery were reasonable based on the evidence presented. See Merck v. State, 975 So.2d 1054, 1061 (Fla.2007) (“Closing argument is an opportunity for counsel to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.”). Given this reasonable inference and the presence of competent, substantial evidence in the record to support the denial of this claim by the postconviction court, we affirm its ruling.
With regard to the transcription error in the Badger testimony, Reynolds claims counsel were either ineffective for their failure to object to or cure the testimony or, more relevantly, that the transcription error prejudiced the conclusion reached by this Court on direct appeal. Defense counsel, who listened to the tape of the trial during the evidentiary hearing, explained that he could not understand the *490 discrepancy between what the court reporter had transcribed and what was presented at trial — that DNA from Reynolds was not found on the vaginal swab. Moreover, even though DNA from Reynolds was not found on the vaginal swab from Christina, it was found on other evidence connecting Reynolds to the crime and presented at trial. In addition, the DNA testing results Badger referenced during trial stated that DNA from Reynolds was not found on the swab, thereby contradicting the contested transcript testimony. We conclude, therefore, that any error with regard to this issue in the transcript was harmless and did not affect our affirmance of the judgment and sentences of death in this case.
Memorial at the Courthouse
Reynolds claims that his trial counsel were ineffective for not conducting a juror inquiry to determine whether any of the jurors had seen a “memorial or shrine” constructed outside the courtroom. He also claims that counsel was ineffective for not moving for a mistrial based on the “improper and highly prejudicial state-sanctioned action by the victim’s family.”
During the trial, the following exchange transpired:
THE COURT: What’s happened, it’s been brought to my attention that somebody has put a memorial or shrine to the victims right outside the courtroom. I don’t know, does anybody know?
VICTIM ADVOCATE: Yes, sir, I do. That is some thank yous that the family has provided to some of the advocates for all their time and attention for the past five years, so—
THE COURT: I understand. Remove it at this time.
VICTIM ADVOCATE: Yes, sir, I will.
THE COURT: Take it out of here. You should know better. That’s not allowed. As I told you before, that takes place outside of the courthouse. Inside the courthouse is a sterile environment.
VICTIM ADVOCATE: Not a problem, sir.
THE COURT: State, any problem with that instruction?
PROSECUTOR 3: No.
THE COURT: Defense, any problem with that instruction?
DEFENSE: No.
THE COURT: State, Defense, approach.
(Whereupon, the jurors were returned to the courtroom.)
BAILIFF: Jury is now present.
During the evidentiary hearing, several witnesses testified regarding their recollection of the memorial. A former victim services coordinator for the State Attorney’s Office testified that she had responded to the inquiry of the trial court regarding the erection of a memorial. She testified that she had informed the trial court that members of the victims’ family had brought flowers for the two advocates who assisted them during the trial. The coordinator stated that although she was at the trial “most every day,” she never saw a shrine or memorial for the victims. She also stated that she was not aware of any situation where the jury would have been able to see the flowers that the victims’ family had brought.
Reynolds’ sister testified that she remembered seeing flowers, a balloon, stuffed animals, a poster board, and pictures outside the courtroom. The sister described seeing this memorial during the penalty phase of the trial, and confirmed that it was placed where the public entered and exited the courtroom, but not where the jury entered and exited.
Reynolds testified that he did not see any flowers, but saw a wreath on a stand *491 with cards and a heart-shaped balloon outside the courtroom. He testified that the jurors must have seen the memorial because “they would have had to see exactly what I seen.” Reynolds also stated that he never instructed his attorneys not to ask the jurors whether they had seen the memorial, and that his attorneys never addressed whether he may have wanted to move for a mistrial based on the erection of a memorial.
During cross-examination of Reynolds, the following dialogue occurred among the court, Reynolds, and posteonvietion counsel:
STATE: My question relates to the positioning of the jury deliberation room that you [Mr. Reynolds] indicate the jury was in when — when they would have had to have seen this what you call a shrine or what — in your motion, and you assume they would have had to come back in that way through the back door, right?
REYNOLDS: I would assume that, yes.
STATE: Okay. Now, I want to move now to claim—
THE COURT: Let me — let me just — I have to interrupt here at this stage, as far as that’s concerned. Because what’s being portrayed here is somehow not— missing in the record, or incomplete.
What transpired on that particular instance was, there was a break. During the breaks, as is the case for years on end and throughout the course of that trial, we admonish the jury to remain away from Courtroom E, not Courtroom B, where the jury trial was being held, because from time to time attorneys need to meet with witnesses, there’s a lot of activity out there, people don’t talk.
The jury is down the hall toward the north end of the building. Mr. Reynolds was correct, the trial room is — the trial courtroom is on the south end of the building. And the lobby area or the mezzanine away by the banks of the elevators.
Mr. Reynolds was brought into the courtroom. Prior to Mr. Reynolds being brought into the courtroom, I had gone down the hall, nothing was in the hallway. I had taken the bench, Mr. Reynolds was brought in, at that time it was brought to my attention that the shrine — and his recollection and his sister’s recollection is more accurate than the witness coordinator for the State Attorney’s office, there was an actual poster board of sorts there at that time. At that time, [I] ordered it to be removed, it was removed, jury was then brought in. Jury was brought in down from the mezzanine area. Jury did not see the shrine, did not have the opportunity to pass by it. They were brought into the room in back. Mr. Reynolds is correct in one extent, there’s a room inside there, they’re brought into the room and taken to the jury room in the back. The jury room used in the courtroom only has one entrance in and out. That’s why mention is made in the record as far as that shrine being there. But the jury was never exposed to the shrine. It was removed before the jury was brought down from the mezzanine area into the courtroom area.
During redirect, the judge added:
THE COURT: And Mr. Reynolds and everybody else is aware of this, you [collateral counsel] aren’t. What happens is, we keep the jury away from Mr. Reynolds, because Mr. Reynolds is correct, he’s in a holding cell down the hall. We keep the jury away from Mr. Reynolds so they don’t see him as he’s being led. I think you had shackles on at that time, Mr. Reynolds.
REYNOLDS: Yes, sir.
*492 THE COURT: Then they remove that in the courtroom. So the jury is down out of sight. In between the time that I came and the time that Mr. Reynolds appeared is when the shrine was put up, and that’s when they told me. As far as Mr. Reynolds, that’s when Mr. Reynolds had the opportunity to see it, as he was being led in the courtroom at that time.
COLLATERAL COUNSEL: Well, Judge, I’ll just ask you straightaway, is there any way you know for sure that these jurors never saw that shrine?
THE COURT: Yes, because I tell—
COLLATERAL COUNSEL: You know for a fact that no one—
THE COURT: Because I tell the Bailiff afterwards to bring the jury down. The same people who bring in Mr. Reynolds that we have the jury brought down.
COLLATERAL COUNSEL: So to clarify the record, you know when the shrine was placed there and you know when it was taken away.
THE COURT: Right.
COLLATERAL COUNSEL: Okay.
When defense counsel testified with regard to whether he noted a memorial outside the courtroom during the trial, he stated:
I don’t remember if it was something we were really concerned about, or just something we were hoping to make a record of. Uhm, there were a courtroom full of angry friends and family every day, so I personally don’t think a little shrine was going to make any difference.
Defense counsel also testified that he believed he would have asked the trial court for permission to question the jurors as to whether they had seen the memorial, but he could not remember if he had done so. The trial record does not indicate that defense counsel requested the inquiry.
Reynolds claims that “[t]he State did not present any evidence that the shrine issue was addressed, removed or that the jury did not see it.” The record, however, refutes this allegation, and indicates that it was addressed by the trial court. Moreover, Reynolds does not provide evidence to support his assertion that the jury actually saw a memorial. Reynolds, instead, only refers to a single case, Holbrook v. Flynn, in which the United States Supreme Court noted that “certain practices pose such a threat to the ‘fairness of the factfinding process’ that they must be subjected to ‘close judicial scrutiny.’ ” See 475 U.S. 560, 568, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (quoting Estelle v. Williams, 425 U.S. 501, 503-04, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)). Holbrook, however, does not address memorials or shrines and ultimately holds that the defendant failed to demonstrate that the presence of four uniformed troopers at his trial was “so inherently prejudicial as to pose an unacceptable threat to [his] right to a fair trial.” Id. at 561, 106 S.Ct. 1340.
Apart from Reynolds’ own testimony, his sister added only that she also saw the shrine, but was uncertain whether the jury had seen it as well. The sister noted that the jury entered through an entrance other than the one where the memorial was located, which establishes that, at a minimum, the jury did not physically pass a memorial upon entering or exiting the courtroom.
Competent, substantial evidence supports the finding of the postconviction court that Reynolds presented no basis to support a conclusion that the jury saw the memorial. Accordingly, counsel was not deficient for failing to request an interview with the jurors to determine if they had seen it. Therefore, we affirm the denial of this claim by the postconviction court.
*493 Mitigation Evidence
Reynolds alleges that his trial counsel were ineffective because they failed to investigate and present evidence of substantial mitigation. He claims that his counsel did not engage experts to interview and evaluate him and failed to call witnesses to testify on his behalf during the penalty phase.
The record reflects that during trial, Reynolds waived his right to present any mitigating evidence. Reynolds signed and filed with the trial court a Waiver of Right to Present Mitigation Evidence. Before the penalty phase, the trial court engaged in a colloquy with Reynolds to address his decision to waive his right to present mitigation:
THE COURT: [I]t’s been brought to my attention by your attorneys that with respect to their defense of you and your participation in this phase of the trial, that you’ve instructed them that you don’t want them to basically do certain things or put forth a defense on your behalf; is that correct, sir?
REYNOLDS: Yes, sir, Your Honor, and the reason why that is is, I mean, you know, it’s been five years, and to get to this point, I never thought that we would get to this point, but here we are.
I’ve been in prison all my life. My mitigating is not nothing compared to the aggravators that the State is gonna bring in here against me.
I know the people of Seminole County and the State of Florida are tired of seeing me about as much as I’m tired of seeing them.
I know I am going to death row, sir, I know by law, and I’m not trying to put words in your mouth or dictate, but I know by the law, I know that you’re by the law, I know that your politics dictate that. I know that is coming and I’m very aware of that. I don’t agree with that, but I know that that’s going to be the outcome. And my wish is this right here, sir, is that I would ask you, that I’ve always conducted myself as a gentleman in your courtroom and respected your wishes and your rules and you would honor my wishes. We don’t, I don’t want to present a mitigating case here because there’s no such thing. I mean, Your Honor, it’s a waste of time because I have [no mitigators]. I’ve been locked up all my life.
My attorneys have done a great job, and at this point in time it’s not a matter of the sentencing in this case, it’s gonna be a matter of a trial that brings me back.
I know, sir, that you have to have time, that you followed this case, I know you was in through it with all through the trial, I would like to request that you would grant a Spencer hearing as quick as possible and to go into the sentencing phase, Your Honor, to get sentenced so that I may leave here because my situation in Seminole County jail, as you’re aware of, has not been very well, and it hasn’t changed, and it’s never have ..., at this point in time I’m tired, sir. I’m tired. And I really am tired, and I’m just wore out.... And if you could grant me a Spencer hearing, if I could get out of here next week, that wouldn’t be soon enough for me. I mean, I’m ready to go, honestly.
And I know the State has to do what they have to do as far as presenting the aggravators, I don’t contest that in any way. My record speaks for itself. I have no mitigating, I have nothing that’s gonna dictate against my record, and I know that the final outcome of this is that I’m gonna go to death row, and I would wish, if you would, and if y’all would honor that and please let me get this done and get up the road. And *494 that’s about the best way I can say it, Your Honor. I’m ready to go. ...
[L]ike I said, I never thought I’d come to this point, but here I am and I got to deal with that. It’s not gonna change, it’s not gonna change here, it’s gonna have to be changed later on, and I realize that. And I just wish that y’all could get me out of here within the next week would be great, two weeks, that would be great, but I don’t want to sit here no three, four, six months, Your Honor. There’s no need.
You’re aware of this case and the State’s been involved in this case and my attorneys and y’all. This is, you know, this trial was very in-depth and everybody was in ... up-to-date on everything, and I know that you’ve been studying, and I know you don’t go home and just forget about it, I know you work on this case and you’ve been aware of this case, and I think that you’re in a situation now that you could rule on this in a week or so, sir.
I think that by law, by the law that you’re gonna have to do what you have to do. And mitigating, I have none. Spencer hearing, there’s nothing else for me to say. There’s nothing else that we could do at this point in time to change what has already happened, not at this time....
THE COURT: [Wjhat I need to tell you is that regardless of your request, I still have to follow certain protocol....
(Emphasis supplied.)
The colloquy regarding the decision to waive mitigation continued among Reynolds, his attorneys, the State, and the court. See supra note 9 (quoting additional text from the relevant colloquy). During the exchange, the trial court questioned Reynolds a number of times regarding his decision to waive mitigation and asked him to reconfirm his decision. The trial court questioned defense counsel as to whether they were prepared to present a case for mitigation and had witnesses ready to testify on their client’s behalf. Defense counsel responded in the affirmative. The court asked the State whether it had any additional questions regarding the decision, and the State requested an inquiry into mental competency. The trial court engaged Reynolds with regard to his competency, which his trial counsel and Reynolds confirmed. Reynolds stated that he did not want to present mitigation because he did not believe he had any to present, and because he did not want to cause his family or the family of the victims additional emotional hardship. The court informed Reynolds that it appeared that his family still wanted to assist him, but Reynolds reconfirmed his decision not to have them testify on his behalf despite their wishes.
After the State concluded its presentation during the penalty phase, the Court recessed to provide Reynolds with the opportunity to again reconsider his decision to waive mitigation. The following day, the trial court again questioned Reynolds with respect to his decision, and he confirmed his waiver. The evidence presented in the trial transcripts alone confirms the ruling of the postconviction court that defense counsel were not ineffective for a failure to present mitigation evidence. Reynolds formed, and clearly articulated, his decision to waive the presentation of mitigation evidence at his trial. Thus, competent, substantial evidence supports the denial of this claim by the postconviction court.
Reynolds next contends that his waiver of mitigation evidence was not voluntary because the trial record demonstrates that his attorneys failed to investigate any mitigation evidence or to prepare for the penalty phase in general. Indeed, this Court *495 has held that “[although a defendant may waive mitigation, he cannot do so blindly....” See Lewis, 838 So.2d at 1113. Counsel must “investigate all avenues and advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision.” Id. (citing Koon v. Dugger, 619 So.2d 246, 249 (Fla.1993)); see also Ferrell v. State, 29 So.3d 959, 983 (Fla.2010).
We conclude that competent, substantial evidence supports the finding of the postconviction court that counsel spent sufficient time investigating mitigation pri- or to the signing of a written waiver of rights to present evidence and the oral acknowledgement before the trial court that Reynolds waived his right to its presentation.[13] The trial record reflects that a presentence investigation report was prepared and reviewed by all. Specifically, during the evidentiary hearing, trial counsel testified that he hired a mitigation specialist to assist in the development of evidence for the penalty phase of the underlying trial. Counsel stated that he and the mitigation specialist worked together to develop mitigation evidence, and that a “big part of [their work] was just trying to convince Michael to let us do anything mitigation-wise.” Trial counsel stated that he and the specialist obtained school records, medical records, records from Arizona and Florida prisons, criminal records from prior criminal cases, and family photographs.
Trial counsel also testified that he hired a psychologist to interview and evaluate Reynolds. Counsel stated that Reynolds “had made it perfectly clear he had no interest in presenting mental mitigation or any mitigation,” and that he met with a psychologist “as more or less a favor to [the mitigation specialist] and I, to make our jobs easier and so that we could do one of the things that we’re required to do.” Counsel explained that he asked the psychologist not to record in writing any of his findings because he was concerned that if they were memorialized, he would have to provide a copy to the State. Counsel testified that he decided not to have the psychologist testify because the psychologist concluded that Reynolds suffered from antisocial personality disorder — a diagnosis that some courts have regarded as detrimental to a defendant’s case for mitigation. Further, counsel testified that he was informed by the psychologist that he would be a better witness for the State than for the defense. Trial counsel reviewed the psychologist’s diagnosis against the DSM-IV, a manual providing standard criteria for the classification of mental disorders. Trial counsel testified that he agreed with the diagnosis of antisocial personality disorder.
Trial counsel also spoke with Reynolds’ two sisters, both of whom were available to testify during the penalty phase. He explained that much of the information he gathered concerning Reynolds’ past came from his conversations with one sister. Trial counsel engaged in a lengthy conversation with the sister at her home, and later obtained her testimony by deposition. He spoke with the sister “behind [Reynolds’] back” because he had determined that Reynolds would not have allowed him to speak with her. Counsel stated that Reynolds “did not want his sisters and family involved.” The sister confirmed that she had been served with a subpoena *496 to testify during the penalty phase and was ready to do so but, during trial, counsel stated, without further explanation, that she was no longer needed to testify.
Based on his investigations, trial counsel was aware that Reynolds: (1) had an alcoholic father who was extremely abusive; (2) lived in poverty during most of his life; (3) had a father who worked sporadically and was absent for long periods of time; (4) was very devoted to his mother as a child; (5) had a sister who was severely disabled; (6) together with his non-disabled sister, took the brunt of his father’s abuse; (7) would be awakened by his father pouring ice cold water on him and his siblings in the middle of the night; (8) was forced to dig a grave for the family’s horse in middle of the night after his father killed it; (9) lost his mother when his father “pulled the plug” on her when she became very ill during the holiday season when Reynolds was a child; and (10) had left home to escape the abuse and was already involved in drugs and alcohol at that time.
A psychiatrist testified during the evi-dentiary hearing that he believed Reynolds suffered from adult antisocial personality disorder. The psychiatrist evaluated Reynolds in August 2009 — eleven years after the murders. Although Reynolds had reported that he had been hit on the head with a baseball bat nineteen years prior, the psychiatrist, relying on this self-report, concluded that this incident was not responsible for Reynolds’ criminal history. The psychiatrist stated that he, the psychologist who had previously evaluated Reynolds, and a social worker all concluded that the problems stemmed from substance abuse and a conduct disorder, likely antisocial personality disorder. The psychiatrist did not believe that Reynolds qualified for any statutory mitigators, or anything different from that produced at trial could have been offered to help Reynolds. Unlike the psychiatrist, the social worker had a different view that Reynolds qualified for a statutory mitigator — that he exhibited extreme mental or emotional disturbance. See § 921.141(6)(b), Fla. Stat. (2003).
At the evidentiary hearing, Reynolds testified that during his trial he was committed to presenting mitigation evidence, and although he confirmed signing and reading the mitigation waiver, he did not remember being advised by the trial court that he could present such evidence. Reynolds asserted that he was not truthful with the court when he stated that he had read and understood the form, and denied the accuracy of the court transcripts which reported that he stated he would rather die than spend his life in prison. Reynolds asserted that he did not present mitigation evidence because his attorneys stated that the State had not met its burden of proof and it was unnecessary for him to present such evidence. He alleged that his waiver, at the time, was not knowing and voluntary, and that he now understood the importance of presenting mitigation.
The testimony provided at the evidentia-ry hearing establishes that the defense attorneys were prepared to present mitigation evidence, but Reynolds decided not to do so. Reynolds had a right to refuse the presentation of mitigation evidence, and he invoked that right at the appropriate time. See Dessaure v. State, 55 So.3d 478, 484 (Fla.2010) (holding counsel is not ineffective for following the wishes of a competent defendant, even if that wish is to not present mitigation to a penalty phase jury). His counsel will not now be deemed ineffective because they followed his decision. See Spann v. State, 985 So.2d 1059, 1070 (Fla.2008); Grim v. State, 971 So.2d 85, 100-01 (Fla.2007); Brown v. State, 894 So.2d 137, 146 (Fla.2004) (“An *497 attorney will not be deemed ineffective for honoring [his or her] client’s wishes.”).
In addition, as evidenced in the sentencing order, the presentation of mitigation evidence during the penalty phase would have been cumulative because it had already been considered by the trial court. Thus, no prejudice can be established. Prior to the Spencer hearing, defense counsel filed documents with the trial court to be considered when sentencing Reynolds. The trial court found the following nonstatutory mitigating circumstances and gave each little weight: (1) Reynolds was gainfully employed at the time of the crimes; (2) he manifested appropriate courtroom behavior throughout the proceedings; (3) he cooperated with law enforcement; and (4) he had a difficult childhood.[14] With regard to his childhood, the court found the following mitigating circumstances: (1) Reynolds suffered from an upbringing marked by physical and psychological abuse; (2) his father was a chronic alcoholic; (3) his mother was chronically ill and often hospitalized during his childhood; (4) he was regularly hit, slapped, and kicked by his drunken father, without warning; (5) during the school week, he would sometimes be kept awake all night by his father and would sometimes be awakened by having ice water poured on him; (6) he regularly cared for his disabled, wheelchair-bound sister because his mother was unable to do so; (7) he helped run household affairs by cooking, cleaning, and doing yard work; (8) he was very close to his mother who died on Christmas day when Reynolds was seventeen; (9) despite his father’s abuse, he still showed his father respect and assisted him around the house; (10) he was a hard worker, beginning employment at an early age by working around the home and mowing lawns in the neighborhood; (11) he attended church as a child, even though his parents did not; (12) his education was limited to the tenth grade; (13) he began using alcohol at an early age; and (14) he essentially had no adult supervision as a child due to his mother’s chronic illness and his father’s habitual drunkenness. The trial court did not find that Reynolds could easily adjust to prison life.
The denial of this claim by the postcon-viction court is supported by competent, substantial evidence. Accordingly, we affirm its denial.
Expert Engagement
Reynolds claims that trial counsel failed to engage expert or lay witnesses to support his theory that the evidence was either legally insufficient to convict him of the homicides, or that someone else killed the victims. We affirm the ruling of the postconviction court.
First, Reynolds contends that his counsel were ineffective for not presenting expert testimony regarding his mental health. We note that Reynolds does not explain the manner in which this alleged failure relates to and negatively impacts his case with regard to the theory that his conviction was premised on legally insufficient evidence or that reasonable doubt exists. Defense counsel retained a psychologist who, as addressed in the prior claim, stated that he believed he would be a better witness for the State than the defense, and diagnosed Reynolds with antisocial personality disorder. Defense counsel, therefore, appears to have strategically decided against calling the psychologist. This Court has held time and again that counsel will not be held ineffective for making strategic decisions that are reasonable under the norms of professional conduct. See, e.g., Schwab v. State, 814 So.2d *498 402, 412 (Fla.2002); Mann v. State, 770 So.2d 1158, 1161 (Fla.2000); Ocehicone, 768 So.2d at 1048. Although Reynolds may have benefitted from the testimony of other expert witnesses, he clearly conveyed to his trial attorneys that he did not want to address his mental health and provide evidence in mitigation during the penalty phase. Although two witnesses who testified during the evidentiary hearing indicated that they could have provided testimony to support mitigation, the record indicates that at the relevant time Reynolds would not have permitted them to testify. Trial counsel, therefore, cannot be deemed ineffective for not presenting mental mitigation evidence.
Second, Reynolds alleges that his attorneys were ineffective for not engaging other experts to refute the State’s theory that the wounds on his hand were caused by a sharp object rather than by a burr on his doorframe. Defense counsel retained a forensic pathologist to review the photos of the wounds. The pathologist concluded that the injury could have been the result of contact with a burr or the result of a struggle. Defense counsel testified that he decided not to have the pathologist testify because the doctor did not fully agree with the explanation Reynolds provided for his injuries. Defense counsel also retained a crime scene investigator and blood-spatter expert. Defense counsel stated that they decided not to have the investigator/blood-spatter expert testify because the expert concluded that the hand injuries were defensive and consistent with a struggle.
During the evidentiary hearing, Reynolds provided the expert testimony of a retired forensic pathologist who testified that, based on his review of the photos of the hand injuries, the injuries were the result of a laceration, or a tear in the skin, as opposed to an incised wound. The pathologist testified that he believed, with ninety percent certainty, that the hand injuries were due to blunt force and consistent with a story of falling and injuring his hand on a metal burr on a door. Thus, the pathologist disagreed with the assessment of the forensic pathologist that defense counsel had retained before the trial.
Although the pathologist who testified at the evidentiary hearing likely would have assisted Reynolds at the time of trial, the fact that the experts who defense counsel consulted at the time of trial ultimately reached unfavorable conclusions does not mean that counsel were deficient. See Carroll v. State, 815 So.2d 601, 618 (Fla.2002) (holding that defendant did not establish that the mental health experts who evaluated him at the time of his trial provided insufficient evaluations because he had now secured more favorable expert evaluations). Moreover, Reynolds has not alleged or established that the failure to call an expert to address his hand injuries prejudiced his case. Reynolds, therefore, failed to meet either of Strickland’s prongs to show ineffective assistance of counsel.
Third, Reynolds claims that counsel were ineffective for not calling any experts to rebut the State’s presentation of DNA evidence implicating Reynolds for the homicides. Defense counsel retained a forensic expert to consult with them regarding DNA evidence and procedures. Although this expert did not testify during the trial, defense counsel testified that the expert advised counsel about “all aspects of DNA” and that “every piece of paper that [counsel] got from [the] FDLE or from the State Attorney’s office that dealt with DNA was forwarded to [the expert].” Defense counsel explained that they (counsel and the expert) would have had a conversation regarding the significance of, and the way to address, each piece of evidence received. Athough counsel testified that *499 he believed that the defense effectively rebutted the issues the State presented at trial, counsel acknowledged that if given the opportunity to retry the case he would have a qualified expert testify to address the DNA evidence. Despite counsel’s admission -with regard to the manner in which he would now address the DNA evidence differently if given a second chance, the record indicates that counsel made a strategic decision not to call expert witnesses and had a reasonable explanation for this decision (i.e., the experts would have provided unfavorable testimony). See Strickland, 466 U.S. at 680, 104 S.Ct. 2052 (“[Counsel's investigatory decisions must be assessed in light of the information known at the time of decisions, not in hindsight....”); see also Schwab, 814 So.2d at 412 (holding that trial counsel’s decision to present particular testimony was strategic and one that counsel could reasonably make).
In addition to retaining experts, defense counsel also had LabCorp, an independent testing facility, test the DNA evidence received from the FDLE. In its review of the evidence, LabCorp reached the same results as the FDLE. Defense counsel moved to exclude the DNA evidence. The court held a Frye[15] hearing to determine whether the DNA testing on this evidence was generally accepted in the scientific community and, concluding that it was, denied the defense’s motion.
The trial record and evidentiary hearing indicate that trial counsel investigated the DNA evidence presented at trial but, due to unfavorable findings, strategically decided against presenting the results of their investigations. Reynolds, therefore, has not shown that his counsel, at the time of trial, were ineffective.
Habeas Corpus Petition Standard of Review
Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). Consistent with the Strickland standard, to grant habeas relief based on ineffectiveness of appellate counsel, this Court must determine
first, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). In raising such a claim, “[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997,1001 (Fla.1981).
Burden of Proof Misstatement
This claim is essentially the same as that raised by Reynolds in the postcon-viction motion regarding the single misstatement of the burden of proof by the trial court during voir dire. We reach the same result here as we did in that claim, and deny relief. Reynolds contends that his appellate counsel performed ineffectively and prejudiced the outcome of his direct appeal by failing to address the misstatement of law at the time it was made by the trial court during voir dire. *500 “If a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Pittman v. State, 90 So.3d 794, 817 (Fla.2011) (quoting Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000)); see also Williamson v. Dugger, 651 So.2d 84, 86 (Fla.1994). Reynolds has not shown that defense counsel were ineffective in handling the misstatement of the burden of proof — this issue was addressed at trial — thus his appellate counsel will not be held ineffective for not arguing it to this Court on direct appeal. See Rutherford, 774 So.2d at 643.
Automatic Aggravator
Reynolds claims that he was denied effective assistance of appellate counsel because counsel did not raise or discuss the error by the trial court in instructing the jurors on the during the course of a felony aggravating circumstance. Reynolds claims that the finding by the trial court that the murders were committed in the course of a felony amounted to an automatic aggravator. This Court has repeatedly rejected claims that the “committed in the course of a felony” aggravator constitutes an unconstitutional automatic aggravator. See McWatters v. State, 36 So.3d 613, 644 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 510, 178 L.Ed.2d 378 (2010); Owen v. State, 862 So.2d 687, 704 (Fla.2003); see also Johnson v. Moore, 837 So.2d 343, 348 (Fla.2002); Blanco v. State, 706 So.2d 7, 11 (Fla.1997). Therefore, this claim is meritless and we hold that appellate counsel was not ineffective for the failure to present that issue on appeal.
Testimony of FDLE Analyst Charles Badger
Reynolds contends that he was denied his right to a full and fair direct appeal because the trial transcript contained the false statement that his DNA was found on the vaginal swabs from Christina Razor. As discussed previously, Charles Badger’s report did not corroborate this representation and allegation.
It is indisputable that a complete and accurate record is indispensable to a defendant’s right to a full and fair direct appeal. See art. V, § 3(b)(1), Fla. Const, (guaranteeing a criminal defendant’s constitutional right to direct appeal); Douglas v. California, 372 U.S. 353, 356, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (holding that a defendant is entitled to a full and fair appellate review); Delap v. State, 350 So.2d 462, 463 (Fla.1977) (remanding case for a new trial because full transcript of proceedings was unavailable for review by this Court). Although the trial transcript provided on appeal to this Court contained an error, Reynolds was not denied his right to a full and fair appeal of his convictions and sentences because he has not demonstrated that, without this error in the transcript, the conclusion of this Court on appeal would have been any different. During the trial, both the State and defense presented testimony that no semen was found on the vaginal swab from Christina. Then, Badger testified and made the statement upon which this dispute has been constructed. The State, in closing, reiterated the correct DNA results — that no semen was found on or in Christina’s body. Badger’s statement, therefore, at a minimum was bookended by correct and unambiguous statements of fact regarding whether DNA from Reynolds was found on the vaginal swabs.
Furthermore, at trial, the State presented other DNA evidence linking Reynolds to the crime. Investigators recovered a pubic hair from the crime scene with DNA matching the profile of Reynolds. Investigators also processed a blanket and pillow *501 stained with blood from the scene; the results revealed DNA from Christina and Robin Razor and Reynolds. Investigators also matched DNA from Reynolds and DNA from the Razors to underwear found in the trailer.
In crafting our opinion on the direct appeal, we relied on cases that addressed attempted or completed sexual batteries to support our conclusion that the State’s case does not rely wholly upon circumstantial evidence. See Reynolds, 934 So.2d at 1146-47. Our reliance on this case law, however, does not illustrate, as Reynolds claims, the “pernicious effect of the court reporter’s misstatement of trial testimony.” Evidence presented by the State, including the testimony of Badger, reflected that an attempted sexual battery was a reasonable explanation for a motive for the crimes. As addressed in the analysis of the claim discussing the testimony of FDLE analyst Badger, underwear was found on the floor of the trailer in which Christina and her mother lived and were killed. DNA from Reynolds was on the underwear. Christina’s grandmother testified that Christina always slept with her underwear on. Christina, unlike her mother, was found wearing no underwear. Thus, the State provided evidence from which the jury could infer that an attempted sexual battery occurred. Reynolds has not demonstrated that this alleged error in the transcript fundamentally affected the outcome of his appeal in light of the other DNA evidence the State provided. Therefore, we conclude that Reynolds is not entitled to a new appeal. We deny relief on this claim.

Conclusion

Based on the foregoing, we affirm the denial of relief by the postconviction court, and deny the habeas petition.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.
It is so ordered.

. Huffv. State, 622 So.2d 982 (Fla.1993).

. In its denial order, the trial court stated: "The Defendant continues to argue what he terms 'the Badger lie.' This issue has been litigated extensively throughout the post-conviction process, and is outlined at various points in the record. This Court declined to correct the transcript to comport with the State’s interpretation of what it said, nor did the Court accept that the Defendant's interpretation was correct. The Court simply let the transcript speak for itself, leaving the parties to argue about the differing interpretations. However, this Court has heard the tape of the trial, as did [defense counsel]. It does appear that the State's interpretation of the testimony is correct, especially when noting, as [defense counsel] did, that the presence of a gender marker would necessarily make the identification of the DNA coming from both the Defendant and the female victim a genetic impossibility.” (Citation omitted.)

. This recording was not included in the record on appeal.

. The towel and pillow were packaged together for testing.

. The full conversation between trial counsel and the court regarding the erroneous instruction reads:
PROSECUTOR 1: [RJight before you turned it over to the State, you were talking about the burdens and everything, it’s probably not a big deal, I think you misspoke, you said the State doesn’t have to prove anything.
PROSECUTOR 2: I think you said something to the effect that the State can just, you know, stand back and rest and not do anything.
PROSECUTOR 1: I think you meant to say the Defendant.
THE COURT: Probably did. I think I drove it home enough to where they understand.
PROSECUTOR 1: Yes.
DEFENSE: If you would order that now, we would appreciate that.
THE COURT: Anything further from the State?

. When reading the erroneous instruction out loud, the judge stated: "To prove the crime of aggravated battery, great bodily harm, the State must prove — the defense — for the defense of self-defense must be proved the following two elements beyond a reasonable doubt.” Murray, 937 So.2d at 280 (emphasis in original).

. The burr was also referred to as a notch during trial.

. The following exchange took place regarding whether to keep the sleeping juror on the jury:
THE COURT: Okay. Why don't you talk to your client and make sure that's his position too, then you can announce on the record what your positions are.
DEFENSE: We talked about it.
THE COURT: No, no, no. What does your—
DEFENSE: We've talked to I(sic) him about it. That is his position.
THE COURT: No. What is your position? Do you want her excused or not want her excused?
DEFENSE: No, we want her to continue as a juror.

. The following colloquy occurred:
THE COURT: The State is entitled to go forward with its aggravators ... With respect to mitigation, naturally your attorneys are gonna listen very carefulfly] and very strongly to your request, but I have to make an inquiry first from you and from your attorneys to make sure that certain things have been considered by you—
REYNOLDS: Yes, sir.
THE COURT: — prior to considering your request. And [defense counsel], we have discussed this before, you’ve already had your client examined; is this correct?
DEFENSE: Yes, Judge, and Judge—
THE COURT: I mean by a doctor or psychiatrist or psychologist; is that correct?
DEFENSE: Yes, sir.
THE COURT: Now, with respect to this phase of the proceedings, when we go to the penalty phase, Mr. Reynolds, it's not unusual for attorneys to have their client examined again—
REYNOLDS: Right.
THE COURT: — after the trial by a psychiatrist, typically, or a psychologist, and it's my understanding that in order for us to go forward and not to have that come back on us somewhere down the road and say that, well, your attorneys didn't consider that, and even though Mr. Reynolds wanted to go forward *486 and waived his participation in the hearing, he still should have had a psychiatrist examine him. Are you telling me that you want to dispense with having the psychiatrist examine you at this stage?
REYNOLDS: Oh, yes, sir. I’m not crazy, no by far, chance, far, my sanity hasn’t changed ever.
THE COURT: But you got to listen to my question.
REYNOLDS: Right.
THE COURT: Are you saying you do not want to have a psychiatrist—
REYNOLDS: No sir.
THE COURT: — examine you at this time?
REYNOLDS: No, sir.
THE COURT: I don’t mean to be — When you say no, sir, you would have to say no, sir—
REYNOLDS: No, sir, Your Honor, I don’t wish to see a psychiatrist at this time.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The Rugrats item is referred to as both a blanket and sleeping bag throughout the record. Christina’s grandmother claimed it was a sleeping bag.

. Defense counsel testified:
[T]here was evidence that was presented during the course of the trial that there was a blanket that the child had that had Mike's DNA on it, allegedly. Her panties that were locate[d] near her had Mike's DNA on it, allegedly, and then there was a pubic hair that was located near both of those.
And it was my position then and still is now that that leads to an inference based upon the evidence in the case that the State could argue that there potentially was or was an attempted battery of the child. Sexually.

. The State suggests that Reynolds also claims that the trial court failed to conduct a proper Koon inquiry regarding his decision not to present mitigation. Reynolds disagrees with this characterization of his claim. Given that Reynolds’ claim fails regardless of the Koon issue, we have not addressed it further.

. The trial court gave no weight to the mitigating circumstance of residual doubt.

. Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).