# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

————————————————

No. 1D20-3671

————————————————

TROY M. TUTEN,

    Appellant,

    v.

STATE OF FLORIDA,

    Appellee.

————————————————

On appeal from the Circuit Court for Clay County.
Michael S. Sharrit, Judge.

September 29, 2021

PER CURIAM.

Appellant, Troy M. Tuten, appeals the trial court's order denying relief as to six of his claims in his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Finding no error in the trial court's denial of the claims, we affirm the order on appeal.

*Trial Proceedings*

The State charged Appellant with three counts of sexual battery against A.F., his stepdaughter, attempted capital sexual battery against A.F., lewd or lascivious molestation against A.F., lewd or lascivious conduct against W.F., his stepson, and two counts of lewd or lascivious exhibition against W.F. The offenses

allegedly occurred between 2008 and 2015. Appellant moved to suppress the statements he made during a police interview on the basis that they were obtained through threats and promises of leniency made by a detective in the station's parking lot prior to the interview. In the order denying Appellant's motion, the trial court found that "the statements which [Appellant] alleges were made by [the detective] in the parking lot prior to the recorded interview were never made."

During Appellant's trial, W.F. testified about seeing A.F., who was eleven years of age at the time, performing oral sex on Appellant. He then saw the two "g[e]t in the bed and started doing intercourse." Appellant had W.F. watch and told him to get himself ready because he was next. There were a "few other times" when W.F. walked in on Appellant and A.F. Appellant told W.F. that he would kill him if he threatened to call the police.

A.F. testified that the first incident with Appellant occurred when she was approximately ten years of age. She explained, "First thing I remember was around close to [Appellant's] birthday me and my brother were cleaning out the shed and he pulled me aside and asked me to touch his – play with his private area, and I told him, no. I went back to work." A few weeks later, Appellant called A.F. into his bedroom, "asked [her] to close the door, and [she didn't] remember all the details but it was the first time [they] ever had any intercourse involving sexual activity." She testified, "He put his penis into my vagina." When asked the next thing she remembered, A.F. testified, "I just remember that it – he would call me in there every couple weeks or maybe once a week to ask me to do it with him." Appellant started having her "give him like hand jobs and blow jobs every now and then, too." When asked if W.F. ever became involved, A.F. testified, "One time around maybe 11 or 12 [Appellant] called him in there to join in." A.F. affirmatively responded when asked if Appellant's behavior continued until she was "about 17."

When asked on cross-examination about the shed incident and whether Appellant asked her to give him oral sex, A.F. replied, "It wasn't oral sex. He just asked me to play with his private area." She testified that W.F. did not watch her and Appellant have sex. When asked if Appellant ever recorded any incidents, she

2

affirmatively responded and testified that it happened in January or February 2015. Appellant used his cell phone, but A.F. "stayed in the room to make sure he deleted it." After A.F. testified that she would change her brother's diapers, trial counsel asked, "Now a little off topic here. When you would change Charlie's diapers you noted that Charlie wasn't circumcised –." After the prosecutor objected for "relevance," the trial court asked what the next question was, to which trial counsel replied, "In deposition she said she didn't know that [Appellant] was circumcised." The trial court stated, "You can ask her that. I don't get the point." The following then transpired:

*Court*: She doesn't know what circumcised means?

*Trial counsel*: I'm assuming she does know what circumcised means because she doesn't know that [her brother] wasn't and she doesn't know if [Appellant] –

*Court*: What does that have to do with the child?

*Trial counsel*: Okay. I'll just move on to the next question.

. . . .

*Court*: The objection is sustained.

Thereafter, trial counsel asked A.F. whether she had any idea if Appellant was circumcised, to which she replied, "No. I never knew what circumcised was or what it looked like, if it was or not." Appellant made A.F. and her boyfriend break up in July 2014.

A detective testified that he met Appellant outside the police station before his interview. He read a portion of a letter Appellant wrote in jail twelve days after the interview; Appellant said in part, "I've done wrong. I know and I'm sorry for the grief I've caused . . . . I made a mistake with the kids and now I could be gone for life. . . . Yes, some things I'm accused of is [sic] true and some are not. I'm not a monster." Appellant later wrote, "I'm very ashamed of my actions and I beg their forgiveness and I hope one day we can be reunited and my kids can have their daddy. . . . For the stuff we are guilty of trying to get the prosecutor to give us

3

whatever they want by suspend sentence and withhold adjudication and not be registered sex offenders so you can keep your job and we can keep our kids . . . ."

During his police interview, which was played for the jury, Appellant affirmatively responded when asked by the detective if he ever inappropriately touched A.F. Appellant stated that he and A.F.'s mother "showed [A.F.] a couple of things that [they] should have never," and he admitted that A.F. had performed oral sex on him. When the detective talked about A.F.'s accusations and asked, "Did you guys only have sex the one time or was it more than one time," Appellant replied, "If it happened at all it might have been when I drank like a wine cooler one night. I don't think it happened. I seriously don't. I'm telling the truth. I mean I do not think it happened." He later stated, "That's the only time that I can think it might have happened." When asked how long it lasted, Appellant replied, "If it happened at all seconds." When another detective asked, "You're somebody that made a mistake, right," Appellant replied, "A big mistake." Appellant later stated, "She's telling the truth." He explained, "It happened twice. The first time she was curious and kept asking questions and asked the things that happen. I don't know why I did it. The second time she threatened me. She said I'll tell Mom if you don't." Appellant denied videotaping any of the encounters. When later asked how many times they had sex, Appellant replied, "I think I'm going to be kind of high on this and say five." When his questioning resumed, the detective testified that nothing of interest was found on Appellant's phone. On cross-examination, the detective explained that he and Appellant did not discuss the case outside of the police station.

After the State rested its case, trial counsel told the trial court that he advised Appellant not to testify because of his seven felony convictions and two crimes of dishonesty, inconsistent statements, and "some other letters that he wrote." Appellant affirmatively responded when asked by the court whether he had the opportunity to discuss "this" with counsel, whether he had enough time to reflect on how he wanted to proceed, and whether he understood that it was ultimately his decision.

4

During the State's closing argument, the prosecutor argued in part:

> If it's one incident wouldn't they [A.F. and W.F.] just sit down and make sure that they got the whole thing right?
>
> Why would there be any differences? . . . Talking about something that happened to him when he was 9, something that happened to her when she was 10 or 11 years old, years and years ago. They remember an incident but the details of it are different because for her it's pretty difficult and for him it was pretty unusual.
>
> **I submit to you that [W.F.'s] version is probably the more accurate of the two simply because it was something that was atypical for him**. . . .
>
> . . . .
>
> You take the law. You take the facts. You take your common sense and all the information that has been presented and you make a determination and that determination under all the evidence in this case is very clear. **This man molested his children.**
>
> . . . .
>
> [I]t's pretty simple. Everything that she did, everything that she lived through, everything that [W.F.] lived through, all of it points to one irrevocable fact, **[Appellant] is guilty as charged of everything**. . . .

(Emphasis added).

The jury found Appellant guilty of seven of the eight charges. The trial court sentenced Appellant to life imprisonment on two counts, thirty years' imprisonment on three counts, and fifteen years' imprisonment on the remaining two counts. Appellant argued on appeal that the trial court erred in not suppressing "his involuntary confession obtained through police coercion." This

Court per curiam affirmed. *See Tuten v. State*, 234 So. 3d 671 (Fla. 1st DCA 2017).

*Postconviction Proceedings*

Appellant filed a motion for postconviction relief pursuant to rule 3.850 and a supplement to his motion in which he raised a total of nine claims for relief, only six of which are at issue in this appeal.

In Ground 1, Appellant alleged that trial counsel was ineffective for advising him not to testify at trial when he was adamant that his confession was the result of coercion and promises made by the interviewing detectives. According to Appellant, he was promised a lenient sentence and a reunion with his family while in the "station parking lot" before being read his rights.

In Ground 3, Appellant alleged that trial counsel was ineffective for failing to admit phone records to impeach A.F.'s testimony and corroborate his defense. Appellant claimed that while A.F. testified that she did not communicate with her boyfriend from September 2014 to March 2015, the phone records he obtained showed that A.F. had been in contact with him.

In Ground 4, Appellant alleged that trial counsel was ineffective for failing to impeach A.F. with her prior inconsistent statement that Appellant asked her to suck his penis in their shed. Appellant argued that had trial counsel impeached A.F. with her statement, her trial testimony would have been undermined by showing that she was untruthful.

In Ground 5, Appellant alleged that trial counsel was ineffective in failing to call the technician who analyzed his phone and who found no video, contrary to A.F.'s allegations. Appellant asserted that the analyst would have testified to the procedures that he or she performed on the phone and would have explained how nothing is truly deleted from an electronic device.

In Ground 6, Appellant alleged that trial counsel was ineffective in failing to object during closing argument to the prosecutor's statements: "I submit to you that [W.F.'s] version is

probably the more accurate of the two simply because it was something atypical for him," "This man molested his children," and "Troy Tuten is guilty as charged of everything."

In Ground 9, Appellant alleged that trial counsel was ineffective in failing to challenge A.F.'s trial testimony concerning circumcision, which was "wholly inconsistent" with her deposition testimony that she did not know if Appellant was circumcised.

During the evidentiary hearing on Grounds 1, 3-5, and 9, trial counsel testified that Appellant agreed with him that testifying would not be in his best interest. Trial counsel did not recall any discussion with Appellant about cell phone records. He explained, "[B]ut, you know, had to do it all over again I guess I could have brought that up to him and we could have looked for cell phone records, you know. Obviously when you look at a trial after the fact there are moments of regret from things that I know I could have done better." He further testified that A.F. admitted during trial to having some form of communication with her boyfriend against Appellant's wishes, so counsel "thought that was covered at the time decently." When asked if he thought cell phone records were something that would have made a difference, counsel testified in part, "I mean I'd have to say, yes, it would have strengthened my argument. Would it ultimately have made a difference in the end beyond a reasonable doubt? I don't know." When asked about not calling the forensic examiner to testify that no videos of Appellant and A.F. were found on Appellant's phone, trial counsel testified that his concern was that a "thorough forensic search of an electronic device doesn't always yield, you know, every photograph or message or even video, and I didn't want to risk having that explanation given."

When asked about A.F.'s testimony concerning the shed, trial counsel testified in part:

> I regret not getting into that more. . . .
>
> So I could have – I could have done a better job there but I think my strategy at that point had been – you know – it's not for me to judge at this point but my strategy then was, look, I wanted to demonstrate the absurdity of [A.F.] making this claim that [Appellant] was asking her

7

to perform a sexual act on him after sending her [blacked out] to go get something from the house when he knew he was going to be back at any second and it would be witnessed.

When asked about "the circumcision," trial counsel testified:

> The same thing. I think [Appellant's] characterization of me is pretty good there. I – an objection was made. I – it was during the flow of the testimony there and I – I really wasn't expecting an objection. Hindsight again I guess I should have been expecting it. I wanted to develop the testimony that – that [A.F.] had changed the diaper of her younger [brother] before. Therefore, she may or may not know what a circumcised penis is and therefore, well, she knows what a circumcised penis is so you should – you ought to know what [Appellant's] is or not, and that – I had to admit that Judge Lester kind of threw me off there.
>
> Reading over . . . the trial transcripts I saw I could have done better there. I'm just being candid.

Thereafter, the postconviction court entered an Order Denying Defendant's Motions. This appeal followed.

*Analysis*

In order to establish a successful ineffective assistance of counsel claim, a defendant must show that counsel's actions or omissions were deficient and that the deficiency so affected the proceeding that confidence in the outcome is undermined. *Johnston v. State*, 70 So. 3d 472, 477 (Fla. 2011) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). When assessing alleged deficiency, a court must determine whether the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 477. There is a strong presumption that counsel's actions were reasonable. *Id.* The prejudice requirement is satisfied if there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been

different.  *Id.*  A reasonable probability is "one sufficient to undermine this Court's confidence in the outcome of the trial. . . ." *Simmons v. State*, 105 So. 3d 475, 498 (Fla. 2012).  In reviewing a decision of the postconviction court denying claims after an evidentiary hearing, an appellate court reviews the court's findings of fact under the competent, substantial evidence standard of review.  *Reynolds v. State*, 99 So. 3d 459, 486 (Fla. 2012).  A trial court's application of the law to the facts is reviewed de novo.  *Id.*  To uphold the summary denial of a postconviction claim, the claim must either be facially invalid or conclusively refuted by the record.  *McLin v. State*, 827 So. 2d 948, 954 (Fla. 2002).

## *Ground 1*

As for Ground 1 and Appellant's claim that trial counsel was ineffective in advising him not to testify, the postconviction court determined that Appellant was not entitled to relief because he voluntarily agreed with counsel's recommendation not to testify and because the recommendation was a reasonable strategic decision.  "'[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.'"  *Johnston*, 70 So. 3d at 477 (citation omitted).  The record establishes that trial counsel thoughtfully considered whether Appellant should testify, and reasonably advised him not to do so.  As the postconviction court determined, Appellant is not entitled to relief on this claim.

## *Ground 3*

As to Ground 3 and Appellant's claim that trial counsel was ineffective in failing to impeach A.F. with cellphone records, the postconviction court set forth in part:

> . . . The Court agrees with counsel that if he would have impeached [A.F.] with the cellphone records, his argument of false allegations could have been strengthened.  However, outside of [A.F.'s] testimony, the jury was also presented with [W.F.'s] testimony regarding a sexual encounter between [A.F.] and

9

Defendant, Defendant's partial confession, and the letters written by Defendant. Thus, the Court is not persuaded that if counsel did present a conflict between the cellphone records and [A.F.'s] testimony of when she resumed communications with [her boyfriend] there would have been a reasonable probability that the outcome of the proceedings would have been different. Because Defendant has failed to show prejudice, he is not entitled to relief on Ground Three.

We agree with the court and find no error in the denial of relief as to this claim.

## *Ground 4*

As to Ground 4 and Appellant's claim that trial counsel was ineffective in not introducing A.F.'s sworn statement to impeach her, the postconviction court set forth in part:

[A.F.'s] sworn statement is not found in the Court's records, and Defendant did not introduce [her] sworn statement at the evidentiary hearing. . . .

. . . .

Neither [A.F.'s] deposition testimony nor her trial testimony was inconsistent with A.F.'s sworn statement. . . . Therefore, counsel had nothing to impeach.

Even assuming counsel was able to get A.F.'s sworn statement before the jury, the Court is not persuaded that the statement pitted against her inability to recall that statement would have undermined A.F.'s credibility to the extent that the outcome of the trial would have been different. The evidence of the shed incident was not necessary to convict Defendant.

We agree with the court that Appellant failed to establish the necessary prejudice with respect to this claim and that he is, therefore, not entitled to relief.

10

## Ground 5

As for Ground 5 and Appellant's claim that trial counsel was ineffective in failing to call the forensic analyst who searched his phone, the postconviction court found that trial counsel's decision to forego further discussion or analysis about the contents of Appellant's cell phone and to not introduce a forensic analyst was a reasonable, strategic decision. Appellant has not shown otherwise on appeal. As such, he is not entitled to relief as to this claim. *See Brooks v. State*, 175 So. 3d 204, 222 (Fla. 2015) ("[B]oth the record and our prior precedent demonstrate that trial counsel made a reasonable, strategic decision . . . to pursue the theory of reasonable doubt by arguing, through inference rather than witness testimony, that no forensic evidence linked Brooks to the murders.").

## Ground 6

In Ground 6, Appellant claimed that trial counsel was ineffective in failing to object to certain statements made by the prosecutor during his closing argument. The postconviction court found that summary denial of the claim was appropriate because the challenged statements could be reasonably inferred from the evidence presented during trial, the prosecutor did not place the government's prestige behind the witnesses or indicate that there was undisclosed evidence that proving Appellant's guilt, and the prosecutor did not state his opinion of Appellant's guilt.

An attorney's role in closing argument is to help the jury in analyzing and applying the evidence, "including the attorney's suggestions as to what conclusions can be drawn from the evidence." *Valentine v. State*, 98 So. 3d 44, 55 (Fla. 2012) (internal citation omitted). As such, attorneys are given wide latitude during closing argument to review the evidence, draw reasonable inferences from the evidence, and advance all legitimate arguments. *Patrick v. State*, 104 So. 3d 1046, 1065 (Fla. 2012). It is error for the State to make statements that invite the jury to convict the defendant for some reason other than that it proved its case beyond a reasonable doubt. *Warmington v. State*, 149 So. 3d 648, 652 (Fla. 2014). For instance, a prosecutor may not express his or her personal opinion on the credibility of the witnesses,

11

except to the extent such opinion is based on the evidence. *Valentine*, 98 So. 3d at 55; *see also Toler v. State*, 95 So. 3d 913, 917 (Fla. 1st DCA 2012). However, "an attorney is allowed to argue reasonable inferences from the evidence and to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254–55 (Fla. 2006).

Taking first the prosecutor's statement about W.F.'s version being more accurate, the prosecutor was clearly attempting to address any inconsistency between the testimony of W.F. and A.F. and to provide an explanation of why his version of events was likely more accurate. Appellant's challenge to the prosecutor's statements that he molested his children and was guilty of the charged offenses is likewise unavailing because the statements were based on the evidence and were not merely the prosecutor's opinion. *See Valentine*, 98 So. 3d at 55. The postconviction court did not err in summarily denying relief as to Ground 6.

## *Ground 9*

As for Ground 9 and Appellant's claim that trial counsel was ineffective in not challenging A.F.'s trial testimony regarding circumcision, the postconviction court set forth in part:

> The Court does not find that [A.F.'s] deposition testimony and [her] trial testimony regarding circumcision was "wholly inconsistent." As such, [she] could not be impeached during her trial testimony.

> That said, counsel acknowledged at the evidentiary hearing that he could have done a better job handling the circumcision issue. . . .

> . . . .

> Nonetheless . . . the Court is not persuaded that there was a reasonable probability that the outcome of the trial would have changed had the jury known that [A.F.] knew her younger [brother] was uncircumcised.

12

We agree with the postconviction court's assessment of Ground 9 and its conclusion that Appellant is not entitled to relief on this claim.

Accordingly, we affirm the order on appeal.

AFFIRMED.

LEWIS, MAKAR, and BILBREY, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Troy M. Tuten, pro se, Appellant.

Ashley Moody, Attorney General, and Robert "Charlie" Lee, Assistant Attorney General, Tallahassee, for Appellee.